44144. CAPITAL AUTOMOBILE COMPANY v. GENERAL MOTORS ACCEPTANCE CORPORATION et al.

ARGUED JANUARY 8, 1969—DECIDED FEBRUARY 12, 1969.

*Westmoreland, Hall & O'Brien, Donald E. O'Brien, John L. Westmoreland, Jr.,* for appellant.

*Davis & Stringer, Thomas O. Davis, Stone & Stone, Noah J. Stone, Wilkerson, Nance & Head,* for appellees.

EBERHARDT, Judge. The conclusion which appellant Capital Automobile Company desires us to reach upon this review of the denial of its motion for summary judgment is that the evidence conclusively shows that M. M. Armistead, in his purchase of a Cadillac, knowingly dealt individually with James W. Bailey, Capital's automobile salesman who actually had title to the automobile, so that Armistead cannot look to Capital for recompense because of the foreclosure of a security interest created by Bailey covering the automobile. The litigation was instituted when General Motors Acceptance Corporation (hereafter called GMAC), claiming an indebtedness of $4,892.59, sought to foreclose a "contract retaining title" which it had purchased from Capital. This contract, entered into on April 26, 1966, between Bailey as purchaser and Capital as seller, provided for the sale of a new 1966 Cadillac for a cash delivered price of $7,133.39, with a cash down payment of $1,614.90, the deferred balance to be paid in eleven monthly instalments of $100 with a final payment of $4,892.59. On May 25 a certificate of title was issued showing Bailey as owner and GMAC as the lienholder. Bailey made the payments of $100 but failed to pay the last instalment under the "balloon note." When the levy was made the automobile had been sold to Armistead in the transaction with Bailey here under investigation, and Armistead interposed his claim. He also filed a third-party complaint against Capital, contending that if GMAC held a valid lien superior to his title, Capital would be liable over to him as for a breach of warranty of title, and because Capital put Bailey in a position, while apparently acting within his authority as Capital's salesman, to commit a fraud upon him by selling him an automobile subject to a security interest under the Motor Vehicle Certificate of Title Act while purportedly selling him the automobile out of Capital's inventory, in which event he would normally expect to take free of security agreements covering the inventory. See *Code Ann.* § 68-405a; *Code Ann.* § 109A-9—307 (1); *McDonald v. Peoples Auto Loan &c. Corp.*, 115 Ga. App. 483, 486 (154 SE2d 886). Under this record there can be no question but that Bailey was the owner of the automobile at the time of the transaction with Armistead

(see *Code Ann.* § 68-411a (c) ; *Thornton v. Alford,* 112 Ga. App. 321 (145 SE2d 106)), and that there is no presumption that Capital owned the automobile merely by virtue of its alleged possession through Bailey, its agent. *Wreyford v. Peoples Loan &c. Corp.,* 111 Ga. App. 221 (141 SE2d 216). Thus Armistead's claim as to Capital's breach of warranty of title must fail, and the only issue raised for our consideration is whether the trial court properly found a genuine issue of fact as to whether Armistead, in his purchase of the Cadillac, knowingly dealt with Bailey as an individual, in which event Armistead could not claim he was defrauded.[1]

In its motion for summary judgment against Armistead, Capital specified the pleadings, the affidavit of its president, and the deposition of its secretary-treasurer. In response Armistead filed his affidavit, where he stated in substance:

In October, 1964, he went to Capital's place of business and talked with Bailey, one of Capital's salesmen, about purchasing a Cadillac. The dealings with Bailey culminated in the sale to Armistead of a 1964 Cadillac, $2,000 cash being paid at the time and the balance two or three days later. At the time of the purchase Bailey informed Armistead that a certificate of title to the automobile showing Armistead as owner would be obtained and sent to him, and thereafter this was accomplished.

Then in October, 1966, Armistead wanted to buy another Cadillac and went to Capital's place of business, again talking with Bailey. Bailey showed Armistead several Cadillacs on the premises, some new and some demonstrators. "Said salesman then told claimant [Armistead] that they have a car he thought claimant would like, 'but it is at [my] house today.' " Bailey suggested that they go out to the house and look at the automobile, and drove Armistead there in one of Capital's automobiles. Armistead examined the car and liked it. "Salesman Bailey went in the house and came back out and said the

---

[1]In addition to denying Capital's motion for summary judgment, the court granted GMAC's motion for summary judgment and ordered that the foreclosure and levy proceed to sale. There is no appeal or enumeration of error concerning this judgment.

car delivered for $7,133 and that he would let claimant have all off that the Company would allow. Bailey went to make a telephone call and came back and told claimant that they would sell him the car for $5,500, including sales tax." Bailey drove Armistead back to Capital's place of business in the automobile, where Armistead paid him $2,500 in cash and stated he would make a loan and pay the balance the next day, which was subsequently done. Bailey then delivered the car to Armistead at Capital's place of business and told him the title papers would be delivered. Armistead did not receive the papers, however, and each time Armistead called, Bailey stated that the papers would be sent to him.

In May or June, 1967, Armistead became impatient about the matter and went to Captial's place of business and requested his title papers from a Mr. Roy Roberts, an officer of the company. When Armistead gave Roberts the identification number of the automobile, Roberts replied that he had caught Bailey stealing but that he was under bond, and that he would look into the matter and let Armistead know. Roberts did not call, however, and the next thing he heard was that the automobile was being levied upon, which was the first notice he had that GMAC claimed a security interest.

Elwyn C. Tomlinson, president of Capital, stated in his affidavit that the automobile had been sold by Capital to Bailey on April 26, 1966; that whatever sums of money paid by Armistead for the automobile were paid to Bailey; that Capital never received any part of the purchase price; that the check and receipt involved in the Armistead-Bailey transaction were made payable to Bailey individually; that Bailey did not have authority to sell the automobile on behalf of Capital or to represent to anyone that it was Capital's property; and that Bailey was not acting on behalf of Capital in the transaction.

The check for the $3,000 balance given by Armistead to Bailey was made payable to "James W. Bailey" and was indorsed by Bailey. The receipt given by Bailey for the cash down payment was made out on what appears to be the back of a bank deposit slip and reads:

"10/19/66

"Received of M. M. Armistead $2,500 cash deposit on '66

Cadillac from—James W. Bailey. 1966 Cadillac Sedan DeVille List Price $7,133."

In the face of this evidence produced by Capital, however, Armistead states in paragraph 5 of his affidavit: "Claimant says that he purchased said automobile from Capital Automobile Company through its salesman, James W. Bailey, and that said Company is a Cadillac automobile dealer and held said salesman out to the public, including claimant, as its duly authorized agent to sell automobiles."

C. W. Minton, secretary-treasurer of Capital, stated in interrogatories propounded by Armistead that no new Cadillac was sold to or purchased by any of its salesmen to be used as demonstrators; that no automobile was sold or financed by Capital to any salesman to be used as a demonstrator; that the Cadillac in question was sold outright to Bailey for his own personal use with no requirement or request that it be used as a demonstrator, and that it was financed by GMAC to Bailey on terms the two parties decided upon; that the automobile in question was not included as an item of liability in Capital's claim against the bonding company for Bailey's acts and that in general there was no plan or requirement whereby salesmen financed new Cadillacs each year to be used as demonstrators under any arrangement such as that of Bailey's agreement of April 26, 1966.

Minton gave conflicting answers on his deposition, however. He testified that although Capital had "house" demonstrators, and although most cars sold to employees were supposed to be for their own personal use under a plan where "we allow them to go along till a few months before the new models are going to come out and let them sell them then, you see, so they can get them another one," Capital required Bailey and other salesmen to buy or "floor plan" the new models as they came in and use them as demonstrators. Generally the idea was that salesmen such as Bailey would buy a new Cadillac on time and use it as a demonstrator in the sale of Capital's automobiles. "That's generally the idea because GMAC has for salesmen a special demonstrator plan. They recognize that dealers or salesmen would prefer to use his own automobile." The "dem-

onstrator plan" generally provided for 11 or 12 payments and the final one for the balance, and the "billing out" to Bailey of the automobile in question was on the special GMAC demonstrator plan. In that transaction Bailey paid out only $165.49 actual cash instead of the $1,614.90 cash down payment noted in the contract, the balance being discounted.

Minton further testified that it was common knowledge among the trade that sometimes a salesman will buy a prospective customer's used car at a price higher than the appraised value if the customer will buy the new car. Minton also knew that Bailey and the other salesmen occasionally bought and sold cars individually, although there was no sign on Capital's premises informing the public of this fact. These cars were kept in various places. "Sometimes they try to keep them on the lot, but we cannot hold them here, so they have their own places that they stash them away." Bailey and the other salesmen had dealer tags on their own automobiles which Capital got for them every year under its master dealer's tag and in the same series. Minton further testified from his records that the Cadillac sold to Armistead in 1964 was a "Bailey demonstrator."

From a consideration of this evidence and the contentions of the parties we have concluded that the crucial matters in this appeal relate to the construction of paragraph 5 of Armistead's affidavit and the credibility problem it raises. For Armistead, in spite of the fact that he made his check payable to Bailey individually and received an individual receipt from him which was not on one of Capital's customary receipt blanks, nevertheless states in his affidavit that "he purchased said automobile from Capital Automobile Company through its salesman, James W. Bailey." Is this statement to be disregarded as an unsupported legal conclusion, or is it to be taken as a statement as to who Armistead *thought* he was dealing with? In other words, is this statement to be construed as evidencing Armistead's state of mind or intention in this transaction so as to support his contention that he was acting upon Bailey's misrepresentation? In answering this question we are bound by the familiar rule that the party opposing the motion for summary judgment is to be given the benefit of all reasonable doubts in determining

whether a genuine issue exists and the trial court, construing the evidence most favorably to the opposing party, must give him the benefit of all favorable inferences that may be drawn from the evidence. See, e.g., *Holland v. Sanfax Corp.*, 106 Ga. App. 1, 5 (126 SE2d 442); *McCarty v. National Life &c. Ins. Co.*, 107 Ga. App. 178 (129 SE2d 408). Accordingly we must construe Armistead's affidavit as stating that he thought he was dealing with Capital through its agent, Bailey.

We now encounter the difficulty that although Armistead evidences this state of mind by his affidavit, the making of the check to Bailey as an individual and Bailey's giving him an individual receipt for the cash is strong evidence to the contrary. This appears to pose a problem as to the credibility of Armistead's statement in the affidavit.

"The question of the credibility of witnesses and the related right of cross examination is a murky area of the summary judgment law with conflicting concepts in hostile array. Cases like this, having as an essential factor the state of mind or intent of a person, are difficult of solution." *Darby v. Interstate Life &c. Ins. Co.*, 107 Ga. App. 409, 410 (130 SE2d 360). Accordingly, in a summary judgment case, this court cannot consider the credibility of a witness or his affidavit (*Darby v. Interstate Life &c. Ins. Co.*, supra; *Raven v. Dodd's Auto Sales & Service*, 117 Ga. App. 416, 421 (3) (160 SE2d 633)) and a jury must resolve this question and the conflict in the evidence which it produces. It is therefore our conclusion that the trial court properly refused to take from the jury the question of whether Armistead knowingly dealt with Bailey as an individual, and accordingly the judgment must be

*Affirmed. Bell, P. J., and Deen, J., concur.*