## 42207. McDONALD v. PEOPLES AUTOMOBILE LOAN & FINANCE CORPORATION OF ATHENS, INC.

ARGUED SEPTEMBER 8, 1966—DECIDED MARCH 13, 1967—REHEARING DENIED MARCH 29, 1967—

*Guy B. Scott, Jr., Jack Gunter,* for appellant.

484

*Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Emmet J. Bondurant, Joseph J. Gaines,* for appellee.

FRANKUM, Judge. Warren C. Thurmond & Sons, Inc., hereinafter referred to as Thurmond, held the Lincoln-Mercury dealership at Athens, and, in addition to selling that line of new automobiles, purchased at wholesale from other dealers various kinds of automobiles and retailed them. Homer McDonald, Jr. operated a used car business at Cornelia under the trade name of McDonald's Used Cars and also under the trade name of Hi Point Motors. Thurmond was duly registered with the State Revenue Commissioner, as required by law, as a new and used car dealer, and McDonald was registered as a used car dealer under the trade name of McDonald's Used Cars. Peoples Automobile Loan & Finance Corporation of Athens, Inc. (also trading under the names Peoples Incorporated or Peoples, Inc.) was engaged in the financing, among other things, of automobile dealers. Under its financing plan it obtained from the dealer a security agreement covering all of its inventory of motor vehicles, new or used, then in stock or thereafter acquired, on the basis of which a financing statement complying with the provisions of the Uniform Commercial Code § 109A-9—402, was filed with the Clerk of Clarke Superior Court as required by § 109A-9—302. Under this arrangement the finance company, hereinafter referred to as Peoples, floor planned the vehicles of Thurmond which were held in inventory for resale and additionally purchased from it the conditional sale contracts on vehicles as they were sold. As vehicles were brought into its inventory by Thurmond, money was advanced by Peoples, under the security agreement and financing statement, to pay for them. On each vehicle so acquired Thurmond executed to Peoples a collateral note for the amount advanced in connection with its acquisition, in which the vehicle was fully described, with a recital that the transaction was under the security agreement and financing statement.

McDonald, who testified that he was strictly a wholesaler of used automobiles, sold vehicles to Thurmond over a period of three or four years under an arrangement whereby he delivered possession to Thurmond who took the vehicles into his inven-

tory, while he retained possession of the title registration certificate, to be delivered to Thurmond upon payment of the purchase price, usually out of the proceeds when the vehicle was sold at retail.

McDonald also testified that at the time of and prior to the transactions here involved he was under investigation by the state in connection with his business under the trade name of McDonald's Used Cars, making it difficult for a dealer to whom he might sell to obtain financing on the vehicles, and to avoid bringing his transactions under question and facilitate the financing and obtaining of titles by his purchasers he adopted and used the trade name of Hi Point Motors.

In the latter part of 1965 McDonald, trading as Hi Point Motors, sold to Thurmond a 1965 Oldsmobile for $2,500 and a 1965 Ford Mustang for $2,450. He held a title certificate to the Oldsmobile which had been issued to McDonald's Used Cars by the State Revenue Commissioner, and a certificate of title to the Mustang issued by the Revenue Commissioner to Julian W. and Julian E. Strickland, assigned in blank. These McDonald retained with the understanding that they would be delivered upon payment of the purchase price. However, within a week after the sales were made bills of sale were executed to Thurmond by Hi Point Motors, with the descriptions of the vehicles left blank but, as McDonald testified, with authority to fill them in.

These bills of sale, completed by filling in the descriptions of the vehicles, with motor and serial numbers, were taken by Thurmond to Peoples and used in procuring advances of $2,550 on the Oldsmobile and $2,425 on the Mustang, for which Thurmond executed collateral promissory notes in the manner above described.

At the time of making these advances Peoples did not require production of title registration certificates. The manager of Peoples testified that advances were generally made to dealers on bills of sale because of the delay incident to procuring title certificates from the Revenue Department.

In January 1966, Peoples learned that Thurmond had sold some nine vehicles out of trust; that is to say, had sold the

vehicles and failed to pay to Peoples the amounts which it had advanced against them, and had procured the retail financing for the customer at other places. Because of that Peoples accelerated all of the indebtedness owing on Thurmond's inventory, as it was authorized to do under the security agreement, and foreclosed, obtained the issuance of a chattel mortgage fi. fa. and caused the inventory to be levied on. The Oldsmobile and Mustang which Thurmond had acquired from McDonald were included in the levy, and he filed claim and bond for them.

The issue thus made came on for trial and at the conclusion of the evidence a verdict was directed by which the cars were found subject to the levy.

It is McDonald's contention that title to these cars could pass only by a transfer of the title certificates, and that since he had retained them, his security interest is superior to that of Peoples.

This contention is not sound. In the first place the transaction between him and Thurmond, as well as that between Thurmond and Peoples, is exempt from the provisions of the Motor Vehicle Certificate of Title Act by its own provisions. "This Chapter does not apply to or [a]ffect a security interest in a vehicle created by a manufacturer or dealer who holds the vehicle for sale, but a buyer in the ordinary course of trade from the manufacturer or dealer takes free of the security interest." *Code Ann.* § 68-405a. It is only the security interests created by purchasers at retail, or in the ordinary course of business, which come under the provisions of this Act and which are affected by it.

McDonald admits that he sold the two cars to Thurmond for specified prices, on credit—to be paid when they were resold. He admits that he executed and delivered to Thurmond bills of sale covering the vehicles, and that the transactions (including the bills of sale) were in the name of Hi Point Motors to facilitate financing by Thurmond. What he attempted to do was to create, by oral agreement (there was no written security agreement or retention of title between him and Thurmond) a security interest in the cars running from Thurmond to him.

Clearly, the transactions here are subject to the provisions of the Uniform Commercial Code, and the matter of whether

they are valid and, if so, which has priority must be determined under it.

Was the security interest claimed by McDonald valid? Certainly as to third parties it is unenforceable under the Statute of Frauds as contained in § 109A-9—203, since he had surrendered possession of the vehicles and had not obtained a *signed* security agreement. This is an absolute requisite to the enforceability of the security interest.

The official comment to the Code states that "The formal requisites stated in this Section [§ 109A-9—203] are not only conditions to the enforceability of a security interest against third parties. They are in the nature of a Statute of Frauds. Unless the secured party is in possession of the collateral, his security interest, absent a writing which satisfies subsection (1 b), is not enforceable even against the debtor, and cannot be made so on the theory of equitable mortgage or the like." It is important to keep in mind that the retention of the title certificates by McDonald plays no part in the determination of whether he has a valid security interest in the vehicles running from Thurmond to him, for each provision of Article 9 (Secured Transactions) with regard to the rights, obligations and remedies applies whether title to collateral is in the secured party or in the debtor. *Code Ann.* § 109A-9—202. Thus, whether McDonald has a valid security interest must be otherwise determined. Under § 109A-9—204 a security interest cannot attach until there is an agreement, and under § 109A-9—203 the agreement must be in writing unless the creditor keeps possession of the collateral.

But assuming that there was a valid agreement creating a security interest in McDonald, what of the priorities? Peoples did obtain a written agreement and did perfect its security interest by filing in accordance with the provisions of § 109A-9—302. Since McDonald did not perfect his security interest by the requisite filing, he could have no more than an unperfected interest which is subordinate to that of Peoples. §§ 109A-9—301, and 109A-9—312. "A purchase money security interest in *inventory* collateral has priority over a conflicting security interest in the same collateral *if* (a) the purchase money security

interest is perfected at the time the debtor receives possession of the collateral; *and* (b) any secured party whose security interest is known to the holder of the purchase money security interest or who, prior to the date of the filing made by the holder of the purchase money security interest, had filed a financing statement covering the same items or type of inventory, has received notification of the purchase money security interest *before the debtor receives possession* of the collateral covered by the purchase money security interest *and* (c) such notification states that the person giving the notice has or expects to acquire a purchase money security interest in inventory of the debtor, describing such inventory by item or type." *Code Ann.* § 109A-9—312 (3). (Emphasis supplied.)

It is obvious that McDonald simply could not qualify his security interest (assuming that he had a valid agreement therefor) for priority. Whatever notice of it that may have been brought to the attention of Peoples did not come before Thurmond took possession of the cars.

We must agree that the cases of *Citizens & Southern Nat. Bank v. Capital Constr. Co.,* 112 Ga. App. 189 (144 SE2d 465), *Dunford v. Columbus Auto Auction,* 114 Ga. App. 407 (1) (151 SE2d 464) and *Guardian Discount Co. v. Settles,* 114 Ga. App. 418 (151 SE2d 530) are controlling here.

As was pointed out by Judge Nichols in *Guardian Discount Co. v. Settles,* this is not the type of transaction exempted by the provisions of § 109A-2—326. The sales from McDonald to Thurmond were not "sales on approval" or "sales or return" arrangements.

The result here is entirely consistent with the principle that as between one of two innocent parties who must suffer from a fraud of a third, he who furnished the means to commit the fraud, or whose negligence enables the third party to commit it, must bear the loss. *Code* § 37-113; *Woods v. Colony Bank,* 114 Ga. 683 (2) (40 SE 720, 56 LRA 929). Not only did McDonald fail to perfect his claimed security interest, but he delivered to Thurmond possession of the collateral together with bills of sale, clothing it with indicia of title which, under his

own testimony he knew would or could be used in financing by Thurmond.

Nor is the proposition that Peoples did not give new value upon making the advances on these cars supported by the record. The manager of Peoples testified (and it is not disputed) that although Thurmond indorsed the checks representing the advancements and delivered them back to Peoples, he was credited with these amounts on vehicles which had been previously floor planned and which Thurmond had sold and was paying off, in accordance with the floor plan or security agreement. New money was advanced, though it was immediately used to retire other obligations owing to Peoples. Even if this be regarded as payment on a pre-existing debt it was value under the definition in § 109A-1—201 (44) (b).

The verdict was properly directed.

*Judgment affirmed. Pannell, J., concurs. Felton, C. J., concurs specially.*

FELTON, Chief Judge, concurring specially. I concur in the judgment but not for the reasons stated in the opinion of my associates. In my opinion there was no sale of the two automobiles involved by McDonald to Thurmond. He did state that he sold them to Thurmond but that was only his opinion. What he actually did was to deliver them to Thurmond to sell for him as his agent at a price net to him. It is true that bills of sale were delivered to Thurmond with the descriptions of the cars left blank. When the cars were sold by Thurmond, McDonald was to deliver his registration of title certificates. There was no intention that the cars become the property of Thurmond in its own right. My construction of the evidence is that the cars were delivered to Thurmond to be sold on consignment. If, under the law as it stands today, the mere possession of an automobile constitutes indicia of title, I think it should be changed, since too big a loophole is left for thieves. One holding an automobile on consignment should be required to note the fact on the automobile and he should be in possession of the consignor's title certificate, for those automobiles required by the law to have them, so that lenders could check with the consignee to be sure he had title and was not giving

stolen cars as security. The proceeds of the loan in this case were applied to a pre-existing debt and the loan company parted with no new consideration. But for the Commercial Code, *Code Ann.* §§ 109A-9—108 and 109A-1—201 (44b), the application of the new funds on an old debt, in my opinion, would not constitute new value so as to make the loan company an innocent party for value. The law permitted Thurmond to additionally secure his indebtedness to the appellee with another's property based on its bare possession of the automobiles plus the bills of sale, which, under the new title law, amounts to nothing, because a thief could seek to cover up his theft by such a maneuver. Lenders and buyers seem to be favored under the Commercial Code, but consignors are not. In the situation we have in this case a consignor also should be protected. Where a lender relies on mere possession as indicia of title, when it could demand possession of a title certificate covering the property involved, it should not be regarded as innocent. I concur in the judgment because, as I understand the law, a consignor must file in accordance with *Code Ann.* § 109A-9—302 and especially § 109A-2—326 (3) relating to consigned property where Subsections (a) and (b) are not complied with. So far as I know, Georgia has no law with reference to identification of consigned property by signs placed thereon. See *Guardian Discount Co. v. Settles*, 114 Ga. App. 418, 422 (151 SE2d 530).