This is an appeal from the Hale County Circuit Court condemning and forfeiting one DC6-A type airplane, the "Aruba Star." We affirm.
The two appellants are Air Shipping International Corporation, located in Miami, Florida, and International Aircraft Sales and Leasing Corporation of Ft. Lauderdale, Florida. Prior to the incident in question, Air Shipping had purchased the aircraft from International Aircraft, with the latter retaining a security interest in the aircraft for the unpaid purchase price which at the time of trial aggregated some $90,000.00. Air Shipping had leased the aircraft to International Freight and Trailers, Inc., a California corporation, and this lease was extant when the aircraft was seized.
At approximately 4:00 o'clock A.M. on June 12, 1979 this aircraft landed at the Greensboro Airport in Hale County. City, county and state law enforcement agents seized it and 9,310 pounds of marijuana which was aboard. On June 21, 1979 the State of Alabama initiated condemnation proceedings. Subsequently, Air Shipping filed an answer, and International was allowed to intervene.
A trial on the petition for condemnation occurred on November 13, 1979. Thereafter, on February 8, 1980 the circuit court entered an order condemning the airplane and ordering a public sale. This appeal was taken on March 21, 1980 by Air Shipping, as owner, and by International, as holder of a security interest.
The aircraft was forfeited under the provisions of Code of 1975, § 20-2-93:
 (4) All conveyances, including aircraft, vehicles or vessels, which are used or intended for use to transport . . . for the purpose of sale or receipt of property described in subdivision (1) or (2) of this subsection [controlled substances]; provided, however, that:
. . . . .
 c. A forfeiture of a conveyance encumbered by a bona fide security interest is subject to the interest of the secured party if he neither had knowledge of nor consented to the act or omission. . . .
The record discloses that the State of Alabama proved that the aircraft in question was in fact used to transport marijuana for the purpose of sale or receipt; indeed, this is not disputed by the appellant. Such proof established a primafacie case for forfeiture under our cases:
 It is the law of Alabama that once the State makes out a prima facie case to show violation of the statute which prohibits the transportation of [illegal liquors], the seizure, condemnation, and forfeiture of the vehicle used [are] permitted. . . . *Page 830 [U-Haul Company of Alabama v. State, 294 Ala. 330, 316 So.2d 685 (1975); Mars v. State, ex rel. Black, Ala.Civ.App., 340 So.2d 1131 (1976).]
When that prima facie case was made, it became incumbent upon the appellants/claimants to show that they had no knowledge or notice of the illegal use proved, and could not by reasonable diligence have obtained knowledge of the intended illegal use so as to prevent it. U-Haul Company of Alabama v. State, supra.
This aspect of the claimants' burden has been commented upon inFlint Motor Car Co. v. State, 204 Ala. 437, 85 So. 741 (1920), a case, incidentally, cited to us by both sides:
 [I]f the claimant knows the character of his vendee or mortgagor, and does not know or has not heard of his violating [the prohibition law] or if he does not know him, ordinary prudence should suggest inquiry, and if he does not gain information that he has been considered a violator of [the prohibition law], then he makes out a prima facie case of no negligence in the sale or disposition of [the car], and would be entitled to a decree of nonforfeiture of his claim unless the state rebuts this prima facie case by contradictory evidence or circumstances, or by showing the happenings of subsequent events which would arouse the suspicion of a reasonably prudent man so as to cause action upon his part to prevent the further use of the property for unlawful purposes, and which he failed to prevent.
. . . . .
The appellants' positions are that they did not know of any illegal use and that they did exercise reasonable diligence in the lease of the aircraft without having obtained any such knowledge or notice. The State of Alabama, on the other hand, maintains that the appellants failed to meet their burdens of establishing proper diligence. The resolution of this issue centers around the conduct of Alvaro Robert, the owner of Air Shipping. Mr. Robert was in the import and export business, and also leased large cargo aircraft. He had purchased the "Aruba Star" from International Aircraft Sales and Leasing Corporation on October 13, 1978 for a price of $185,000.00, approximately $90,000.00 of which was still owed. His testimony reveals knowledge on his part of other aircraft having been used to smuggle drugs, and his awareness that in his area no one was leasing aircraft because of the drug problem. In fact, prior to this incident he had been concerned that his aircraft might be used to transport illegal narcotics. He had, in fact, previously sold two aircraft which were subsequently involved in narcotics smuggling, and was aware that this particular airplane had been involved in a smuggling operation before he acquired it. Nevertheless, before the occasion in question the aircraft had been leased a number of times without incident.
On June 1, 1979 Mr. Robert received a telephone call from a Mr. Hernandez, a business acquaintance whom Mr. Robert had known for about one year. According to Robert, Hernandez told Robert that some people from California were in his office and that they desired to lease an airplane. Their own airplane had broken down and they were in danger of losing a contract, he was told. Robert went to Hernandez's office where he was introduced by Hernandez to a man named Schwartz and to another man Robert did not remember, neither of whom had Robert met before. Schwartz showed Robert some paperwork concerning his contract, which was for moving construction material from Panama to Venezuela. Schwartz also showed Robert a photograph of his own aircraft, also a DC6-A, which Schwartz said was being repaired in California. Schwartz's paperwork included stationery with a letterhead and logo of his company.
During their discussion Robert acquainted Schwartz with his business practice of using his own pilots to operate his aircraft under lease, and Robert insisted on his own pilots being used by Schwartz. But, as he explained, Schwartz had his own pilots on salary, and would have expended a large sum of money to pay for two sets of pilots if he were required to employ Robert's pilots. *Page 831 
And so Robert was convinced by Schwartz to forego the use of his own pilots, although this was the first lease under which he did not use his own pilots.
Robert inquired of Hernandez about "the people" and was assured by him of their reliability. Still, Robert was not "perfectly sure that the man was who he represented to be." Therefore, when the lease was executed about twenty-four hours later, after Robert had filled out the data on his printed lease form, Robert required that their lease be notarized by a Florida notary public because he "wanted to make sure that he was the proper man or that he was authorized to make a lease in the name of his company." Robert, however, was not present when the lease was notarized. Even so, this was the first occasion on which he had leased his airplane to someone he did not know. In fact, Robert testified that people would come to his office "two or three times a week" attempting to lease his airplane, but he would turn them down because he did not know them. According to Robert, the only reason he executed this particular lease was because he knew Hernandez and Hernandez told him that Schwartz was a "very good businessman."
When we consider the nature of the property involved and the entire frame of reference in which it was to be used, it is not surprising that Mr. Robert entertained doubts about the identity of Schwartz. Under the circumstances Robert clearly had notice of the facts which would excite suspicion and stimulate inquiry of a reasonably prudent businessman dealing with an aircraft which he had purchased for $185,000.00, of which he had already paid $95,000.00. To satisfy this duty to inquire, was it sufficient to rely upon the recommendations of his acquaintance, Hernandez, and Schwartz's sworn statement that he was who he purported to be? The trial court did not believe that duty was met, and under the facts we cannot state that its decision was clearly erroneous. As was stated inEdwards v. State, 213 Ala. 122, 104 So. 255 (1925):
 The notice necessary to excite suspicion and stimulate inquiry may be slight, but, in any event, will necessarily be left to the determination of the facts in each particular case. . . .
We note, in that connection, that Robert asked for no further identification from Schwartz, made no credit check, did not check the registration of the Schwartz aircraft reportedly under repair in California, did not ask Schwartz for the location in California where the repairs were allegedly being effected, and made no inquiry into the existence, operation or location of Schwartz's California corporation. These also were facts which the trial court could have taken into consideration in determining the issue of reasonable diligence which would have revealed some knowledge of the illegal use to which the aircraft was to be put.
International Aircraft's burden was similar to that of Mr. Robert. As this Court stated in Commercial National Bank ofAnniston v. State, ex rel. Dorman, 251 Ala. 409, 37 So.2d 644
(1948), when the question is whether the holder of the security interest is entitled to allowance of its claim,
 the burden is upon the intervener (1) to establish its superior claim and (2) that it had no knowledge or notice of the illegal use of the [car] and could not by reasonable diligence have obtained notice of the intended illegal use so as to prevent such use. . . .
After the State made out its prima facie case, the intervenor here, International Aircraft, through the testimony of Mr. Robert, had the conditional sales contract with Robert introduced into evidence. Following that, it offered no evidence that it had no knowledge of the illegal use, nor did it go further and show that none could have been obtained through diligent inquiry. Indeed, the trial court could have found that International Aircraft was also chargeable with knowledge that aircraft in its area of southern Florida were not infrequently engaged in drug smuggling, and that Robert himself was in the business of leasing aircraft. Yet the record does not reflect any *Page 832 
effort on the part of International Aircraft to inquire about Mr. Robert himself, the operations of his company, Air Shipping, or to place any restriction in its sales agreement upon the use to which the aircraft was put for its own protection. On that point, we are not persuaded, as the appellants would have us be, that the stipulation of the parties in the trial court removed this issue by establishing that the appellants have no knowledge of the aircraft's use for transporting marijuana. The stipulation itself extends over several pages of the record; however, that portion concerned here followed references to certain motor vehicles, and then continued:
 MR. GREENE: I think you ought to put in the amount of marijuana.
MR. BAXLEY: There was 9,310 pounds of marijuana.
THE COURT: Anything else?
 MR. BAXLEY: We stipulate this is our plane and we have no knowledge of this. We'll stipulate that the State would prove that.
MR. BLAIR: That there was marijuana in the plane. . ..
Admittedly, there is some ambiguity in this stipulation, and we cannot be sure of its exact meaning. Taking the entire conversation together, it is possible that the parties stipulated that Air Shipping and International Sales ("we") have no knowledge of the exact amount, or weight, of the marijuana on board. Or, as the appellants insist, they may have stipulated to no knowledge of any marijuana. This ambiguity was resolved against the appellants by the trial court whose decision under the possible interpretations was not clearly wrong.
In this case, as in Flint Motor Car Co. v. State, supra,247 Ala. at 437, 85 So. 741:
 The trial court saw and heard the witnesses . . . and its conclusion upon the facts is like unto the verdict of a jury, and will not be disturbed by this court unless under similar circumstances the verdict of the jury would be set aside as upon a motion for a new trial; that is, was plainly contrary to the great weight of the evidence. . . .
Applying those principles to this case, we have concluded that the judgment of the trial court is due to be affirmed, and it is so ordered.
AFFIRMED.
TORBERT, C.J., and MADDOX, FAULKNER, JONES, SHORES, EMBRY and ADAMS, JJ., concur.
ALMON, J., not sitting.