This is a Uniform Commercial Code case wherein a secured creditor, by virtue of an "after-acquired property" clause in a security agreement, claimed possession of certain items of inventory furnished to the now-insolvent debtor by the defendants pursuant to "consignment" agreements. The secured creditor, General Electric Credit Corporation (GECC), appealed from a judgment in favor of the consignors, Strickland Division of Rebel Lumber, Inc. (Strickland) and Tommy Smith d/b/a Tri-Cities Portable Buildings (Smith).
Larry Terry operated a business known as Larry Terry Sales, where he sold metal buildings and various other items, including cars, trucks, and appliances. Strickland furnished Terry with his inventory of metal buildings on consignment. Since Terry wished to increase the size of his inventory beyond the number of metal buildings which Strickland would deliver on a consignment basis, Strickland introduced Terry to representatives of GECC, who agreed to floor plan Terry's inventory.
On August 20, 1980, Terry and GECC entered into a financing agreement whereby GECC agreed to pay Strickland for buildings as they were shipped to Terry. Terry then repaid GECC as each building was sold, with the full amount for each shipment due within six months. Terry granted GECC a security interest "in all inventory, new and used, presently owned and hereafter acquired, together with all proceeds of the sale or other disposition thereof."
GECC began making payments to Strickland for shipments beginning in September 1980 and continued to do so until Terry wrote GECC a bad check in January 1981. At that time GECC notified Strickland that it would not finance any further shipments to Terry and Strickland informed GECC orally that it would resume shipments to Terry "on consignment."
When Strickland resumed shipping buildings to Terry, it sent the invoice for each shipment directly to Terry instead of to GECC. Although the invoices, which were on printed forms prepared by Strickland, purported to contain a "purchase agreement" indicating that the buildings were "sold to" Terry, Strickland and Terry entered into an oral "consignment agreement" whereby Terry was given the right to return unsold buildings to Strickland. Each invoice contained the wholesale cost of each building plus a 5% "upcharge." Terry was to remit the wholesale price plus the upcharge to Strickland upon the sale of each building. Terry was allowed to sell the buildings for whatever price he could get from the buyer and was allowed to keep as profit the difference between the amount he received and the wholesale price plus 5%. Even if Terry was unable to sell a building and returned the building to Strickland he would still be liable to Strickland for the 5% "upcharge."
Smith also shipped metal buildings to Terry pursuant to an oral "consignment" agreement. Under the terms of his agreement with Smith, Terry was paid a commission based on a percentage of the amount received for each of Smith's buildings he sold.
Strickland began shipping buildings to Terry knowing that Terry owed GECC an outstanding balance which was secured by the inventory on his lot purchased under the floor plan. Although Terry was still making payments to GECC, GECC called Robert Hawkins, Strickland's president, in the early part of July 1981, and told him that GECC was "getting ready to close out Larry Terry Sales." Hawkins suggested that GECC wait until Terry found out whether he would be able to get a loan to pay off GECC. GECC agreed to wait; however, on or about July 22, 1981, the State Department of Revenue padlocked Terry's lot.
The issue presented on appeal is whether GECC can claim the buildings shipped by Strickland and Smith to Terry "on consignment" by virtue of the "after-acquired *Page 1243 
property" clause contained in its security agreement and properly filed financing statement.
The threshold issue is whether GECC had a perfected security interest in the goods in question as of July 1981. The trial court found that the "security agreement was terminated as indicated by the actions of the parties on or about January of 1981, and therefore, no security interest attached to any inventory or other property of Larry Terry after January of 1981."
Strickland argued that there was evidence to support a finding that GECC and Terry mutually agreed to rescind the security agreement. Terry separated the buildings into three groups; one group for buildings financed by GECC, one for those furnished by Strickland, and one for those furnished by Smith. GECC only inventoried the buildings it financed and it did not demand payment for the buildings furnished "on consignment" as they were sold.
The finding that the parties mutually rescinded the security agreement was clearly erroneous. If GECC had voluntarily abandoned its security interest there would have been no reason to inventory any of the buildings on Terry's lot. Furthermore, the ruling is clearly contrary to the express provisions of the U.C.C., which states:
 "A security interest is not invalid or fraudulent against creditors by reason of liberty in the debtor to use, commingle or dispose of all or part of the collateral (including returned or repossessed goods) or to collect or compromise accounts or chattel paper, or to accept the return of goods or make repossessions, or to use, commingle or dispose of proceeds, or by reason of the failure of the secured party to require the debtor to account for proceeds or replace collateral."
Section 7-9-205, Code of Alabama (1975).
The defendants also argued that even if it had a valid security interest, GECC waived its rights to assert its lien on the property. With regard to that contention, the trial court ruled:
 "GECC had actual knowledge of Strickland's interest in the buildings it shipped to Larry Terry between January and July of 1981, and did not attempt to enforce its security interest (if any it had). This delay in asserting its interest resulted in Strickland continuing to ship buildings all to its ultimate detriment. Due to its inaction in promptly asserting its claimed interest, GECC is now estopped from asserting that claimed interest."
The essential elements of equitable estoppel are: (1) The person against whom estoppel is asserted, who usually must have knowledge of the facts, communicates something in a misleading way, either by words, conduct, or silence, with the intention that the communication will be acted on; (2) the person seeking to assert estoppel, who lacks knowledge of the facts, relies upon that communication; and (3) the person relying would be harmed materially if the actor is later permitted to assert a claim inconsistent with his earlier conduct. Mazer v. JacksonIns. Agency, 340 So.2d 770, 773 (Ala. 1976).
There were no allegations that GECC ever made any misleading communications to the defendants with regard to GECC's security interest. At most, GECC failed to inform Strickland of its interest in the after-acquired inventory when Strickland informed GECC of its intent to supply goods to Terry "on consignment." We find the defendants' implicit assumption, that GECC had a duty to make such a disclosure, questionable at best. That question notwithstanding, in addition to the fact that both defendants were put on constructive notice of GECC's interest by the financing statement, which was filed, Strickland's president admitted at trial that he knew about the floor plan and that he was aware of Terry's outstanding balance when he shipped the buildings. Having negated the presence of the necessary element of lack of knowledge by its own testimony, Strickland cannot rely on estoppel. As to Smith, there was no evidence that GECC even knew of Smith's intention to place inventory on Terry's lot, and certainly no evidence that *Page 1244 
Smith placed the buildings on the lot in reliance on a misleading communication on the part of GECC.
While we recognize that, under certain circumstances, estoppel may properly be invoked against a creditor with a perfected security interest, we reject the notion that a creditor who, in order to assist the debtor and enhance the likelihood of repayment, fails to declare the debtor to be in default at the first available opportunity waives his lien on the debtor's property. Such a rule would violate § 7-9-205, which affords creditors wide latitude in dealing with debtors. It is often in the best interest of all parties concerned to allow a financially unsound debtor to continue in business in hopes that he will thereby have the opportunity to generate revenues in excess of the value of the collateral which may be used to satisfy obligations to secured and unsecured creditors.National Acceptance Co. of America v. Virginia Capitol Bank,491 F. Supp. 1269, 1276 (E.D.Va. 1980).
Having determined that GECC had a valid security interest in the inventory as of July 1981, we must now examine the priority of the parties' claims to the property.
The defendants' claim to the property was based on their consignment agreements with Terry. Unfortunately, the U.C.C.'s treatment of consignments is, in the words of two prominent authorities on the U.C.C., "fraught with uncertainty." J. White and R. Summers, Handbook of The Law Under The UniformCommercial Code § 22-4 at 883 (1980 2d ed.). Prior to the adoption of the U.C.C., courts viewed all consignments with disfavor due to a dislike of "secret liens." Two categories were developed. In "true consignment" situations title remained in the consignor and the consignee acted as an agent or bailee of the consignor. If the consignee had an absolute right to return unsold goods without any obligation to pay for them, the arrangement fell outside the requirement for chattel mortgages and liens. Any deviation from a true agency or bailment transaction caused courts to treat the transaction as a "fake" consignment and to subject it to the filing provisions of the state's chattel mortgage laws. See Bell, Consignments Under TheUniform Commercial Code, 53 Okla. B.J. 1329, 1329-1330 (1982).
The U.C.C. retained the distinction between "true" consignments and consignments "intended as security." Goods shipped on consignment to a business which deals in goods of the kind involved under a name other than that of the consignor are subject to the claims of the consignee's creditors even though the agreement purports to reserve title to the consignor, unless the consignor either establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others or the consignor complies with the filing provisions of Article 9.[1] Section 7-2-326, Code of Alabama (1975). Consignments "intended as security," on the other hand, are governed by Article 9 on secured transactions. Article 9 applies to any transaction (regardless of its form) which is intended to create a security interest in personal property, including a consignment "intended as security." Section 7-9-102, Code of Alabama (1975).
We must determine whether Article 9 applies to the consignments in the case sub judice by deciding whether the parties "intended to create a security interest." White and Summers, supra at 887. Under his agreement with Strickland, Terry was given complete control over the buildings, subject only to the requirement that he remit the wholesale cost for each building to Strickland as each was sold. He was allowed to keep whatever profit he was able to charge over the wholesale price and he was absolutely obligated to pay Strickland the 5% "upcharge" even if he was unable to sell the buildings. Furthermore, the invoice prepared and delivered by Strickland with *Page 1245 
each shipment described itself as a "purchase agreement." Those indicia did not support a finding that Terry was acting as Strickland's agent in selling the buildings, but, to the contrary, supported a finding that Strickland's "consignment agreement" was the functional equivalent of GECC's floor plan with Terry. Therefore, we feel that Strickland's consignment agreement was an attempt to create a security interest and, therefore, was governed by Article 9 of the U.C.C. § 7-9-102,supra. Since the agreement was oral, it was not enforceable as a security agreement against third parties. Section 7-9-203 (1), Code of Alabama (1975); McDonald v. Peoples AutomobileLoan Finance Corp. of Athens, 115 Ga. App. 483, 154 S.E.2d 886
(1967). Therefore, Strickland was nothing more than an unsecured creditor of Terry Sales, and since GECC had a valid, perfected security interest in the goods it was entitled to prevail.
Smith's agreement, on the other hand, was a "true consignment." Terry sold Smith's buildings on a commission basis and was not obligated to pay any charges on buildings he was unable to sell. Therefore, since Smith's agreement was a true consignment, not a consignment intended as security, it was governed by § 7-2-326 (3). The buildings shipped by Smith were subject to the claims of Terry's creditors unless he complied with the filing requirements found in Article 9 or unless Terry was generally known by his creditors to be engaged in selling the goods of others. Section 7-2-326 (3). The trial court found that Terry was generally known by his creditors to be so engaged. Its findings based on evidence presented oretenus carry a presumption of correctness which will not be disturbed on appeal unless palpably wrong, without supporting evidence, or manifestly unjust. The finding was supported by evidence that Terry had a flashing sign in front of his business advertising that he sold goods for other people. He also advertised on radio that he sold goods for others. Several creditors testified that Terry had sold their goods and that it was commonly known that he sold goods for others. Finally, GECC knew Terry sold goods for others. While we are aware that courts strictly construe § 7-2-326 (3)(b) and that the burden of proof was on Smith, we are not prepared to rule that the trial court's finding that Terry was generally known to his creditors to be engaged in selling the goods of others was palpably wrong or manifestly unjust.
Since Strickland's consignment was intended as security, it was governed by Article 9. Therefore, since no valid security agreement was created by the oral consignment, GECC was entitled to prevail. Smith, however, was able to avail himself of § 7-2-326 (3)(b), since his was a "true" consignment.
Therefore the judgment is affirmed as to Smith and reversed as to Strickland.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
TORBERT, C.J., and ALMON, EMBRY and ADAMS, JJ., concur.
[1] Section 7-2-326 also creates an exception when the consignor complies with an applicable "sign law" evidencing his interest. No such sign law exists in Alabama. Bischoff v. Thomasson,400 So.2d 359, 368 (Ala. 1981).