PITTMAN, Judge.
The State of Alabama appeals from a judgment of the Talladega Circuit Court forfeiting to the State a 2006 Ford F-150 pickup truck titled in the name of Holcomb Blake Pressley (“the grandson”), subject to the satisfaction of a $10,774.50 lien on the truck held by Peggy Holcomb (“the grandmother”). We reverse the judgment of forfeiture insofar as it requires satisfaction of the grandmother’s interest in the truck.

Facts and Procedural History

The grandson was arrested at a Tallade-ga motel on December 3, 2009, and charged with the possession and manufacture of methamphetamine. A search of the motel room occupied by the grandson and the pickup truck parked outside that room disclosed methamphetamine, as well as ingredients and equipment commonly used to manufacture methamphetamine. On December 22, 2009, the State filed a complaint pursuant to § 20-2-93(a)(5), Ala. Code 1975, alleging that the grandson had used the truck to transport, receive, or sell controlled substances and seeking forfeiture of the truck to the State. The grandson answered and denied the allegations of the complaint. On March 9, 2010, the grandmother, a 70-year-old retired biology teacher, moved to intervene in the forfeiture proceedings, claiming an interest in the truck. The trial court granted the grandmother’s motion to intervene; the forfeiture case was tried on August 9, 2010. An attorney for the grandson was present during the trial, but the grandson did not present a defense.
The evidence established that on February 9, 2009 — 10 months before the grandson’s arrest and the seizure of the truck— the grandmother and the grandson, accompanied by the grandson’s 2-year-old daughter, had traveled to an automobile dealership in Decatur, Georgia, to purchase a truck. The grandmother testified that she had wanted to buy the truck for herself, to haul yard and garden supplies, and for any member of her family, including the grandson, who might need to use the truck. The grandmother explained that the grandson had been driving an unreliable, older-model truck that had broken down often and that he had occasionally borrowed her automobile to drive to and from his place of employment.
After the grandmother and the grandson had decided on a particular truck to purchase at the dealership, the grandmother telephoned a loan officer at her Talladega bank to inquire about a loan. The officer advised her that she could draw on her existing home-equity line of credit to obtain the funds for the purchase. The bank deposited the funds, and the grandmother issued a check to the dealership in the amount of $14,674.50. The grandmother then telephoned her automobile-insurance agent and asked him to add the truck as an insured vehicle and the grandson as an insured driver on her existing automobile-liability policy.
The grandmother testified that, during the negotiations for the purchase of the truck and the completion of all the paperwork concerning the sale, she and the grandson had taken turns minding the grandson’s two-year-old daughter; therefore, she said, she might not have been *1060 present for all the discussions concerning the sale transaction. She testified, however, that she had assumed that she was the owner of the vehicle because she had paid for it, and, she said, she had asked the business manager at the dealership to “put the truck in [her] name.” John W. Wha-ley, the business manager of the dealership, contradicted that testimony. He said that the grandmother had directed him, in the presence of the grandson, to “title the truck to [the grandson].” Documentary evidence submitted by the State indicates that the grandson’s signature appears on all the sale documents, including the application for a certificate of title to the truck. The certificate of title lists the grandson as the owner of the vehicle.
The grandmother testified that, shortly after the purchase of the truck, she and the grandson had entered into an oral agreement whereby the grandson would pay her the purchase price of the truck. The grandson gave the grandmother a $2,000 down payment and agreed to pay her $50 per week. He also delivered the certificate of title to her. The grandmother testified that she had put the certificate of title in her lock box without looking at it and had not realized until she had retrieved it from her lock box after the grandson’s arrest and the seizure of the truck that the grandson had been listed on the certificate of title as the owner of the vehicle. The grandmother’s uncontradict-ed testimony indicated that the grandson’s drug offense was committed without her knowledge or consent and that she “could not have obtained by the exercise of reasonable diligence knowledge of the intended illegal use of the [truck] so as to have prevented such use.” See Ala.Code 1975, § 20-2-93(h).
The grandson made $50-per-week payments on the truck to the grandmother until his work hours were reduced, after which he paid only $25 per week. When the grandson’s employer went out of business and the grandson lost his job, the grandson painted, mowed, and trimmed shrubbery for the grandmother in lieu of making payments. The trial court found that the grandson’s payments and his labor in lieu of payments totaled $3,900.
The trial court entered a judgment on March 4, 2011, forfeiting the truck to the State, “subject to the unperfected lien of the [grandmother] in the amount of $10,774.50.” The State appealed from that judgment on March 31, 2011. The grandson has not favored this court with a brief.

Standard of Review

“ ‘Our standard of review is well settled. A trial court’s judgment based on ore tenus evidence will be presumed correct and will not be reversed on appeal absent a showing that the trial court acted outside its discretion or that the judgment is unsupported by the evidence so as to be plainly and palpably wrong. Scholl v. Parsons, 655 So.2d 1060, 1062 (Ala.Civ.App.1995). However, when an appellate court is presented with an issue of law, we review the judgment of the trial court as to that issue de novo. Ex parte Perkins, 646 So.2d 46 (Ala.1994).’ ”
Pepper v. Pepper, 65 So.3d 421, 425 (Ala.Civ.App.2010) (quoting Henderson v. Henderson, 978 So.2d 36, 39 (Ala.Civ.App.2007)). The ore tenus standard of review “is applicable only to the trial court’s findings of fact, not its conclusions of law.” Ex parte Cash, 624 So.2d 576, 577 (Ala.1993) (citing Moore v. McNider, 551 So.2d 1028 (Ala.1989), and Williams v. Nearen, 540 So.2d 1371 (Ala.1989)).

*1061
Discussion

In Jester v. State, 668 So.2d 822 (Ala.Civ.App.1995), a father loaned his son money to buy an automobile. The son had signed a document agreeing to pay the father $200 per month until the indebtedness was paid in full. The document included a description of the automobile and identified the father as the “first lienholder.” The father was also listed as the “first lienholder” on the certificate of title for the automobile. The son was subsequently arrested for possession of illegal drugs, and, when the State initiated a forfeiture action against the automobile, the father claimed that his interest in the vehicle was protected under § 20-2-93(h), Ala. Code 1975. That section provides:
“An owner’s or bona fide lienholder’s interest in any type of property other than real property and fixtures shall be forfeited under this section unless the owner or bona fide lienholder proves both that the act or omission subjecting the property to forfeiture was committed or omitted without the owner’s or lienholder’s knowledge or consent and that the owner or lienholder could not have obtained by the exercise of reasonable diligence knowledge of the intended illegal use of the property so as to have prevented such use.”
The parties stipulated in Jester that the son’s drug offense was committed without the father’s knowledge or consent and that the father “could not have obtained by the exercise of reasonable diligence knowledge of the intended illegal use of the property so as to have prevented such use.” The sole question before this court in Jester, therefore, was whether the father was a “bona fide lienholder.” In addressing that question, this court first analyzed the interest claimed by the father under former Article 9 (now Article 9A) of the Uniform Commercial Code (“UCC”)[1] to determine whether he had a security interest in the vehicle and, thus, was a “secured party” within the meaning of former § 7-9-105(l)(m), Ala.Code 1975 (repealed and re-codified, as revised, as § 7-9A-102(a)(72)(A) by Act No. 481, § 1, Ala. Acts 2001 (effective January 1, 2002)), and a “lienholder” within the meaning of § 20-2-93(h).
This court undertook an Article 9 analysis in Jester because the State argued that the father could not be a “bona fide lien-holder” without having a security interest in the vehicle. Although this court did not explicitly say so in Jester, the State’s argument was correct. “Under pre-Code law, practitioners were faced with a variety of security devices, each based upon artificial distinctions. Adoption of the Commercial Code eliminated these devices and their artificial distinctions by replacing them with the Article 9 security interest.” Patterson v. Spradlin (In re Patterson), 185 B.R. 354, 356 (Bankr.N.D.Ala.1995). See Ala.Code 1975, § 7-1-201(35) (“‘Security interest’ means an interest in personal property or fixtures which secures payment or performance of an obligation.”). Since Alabama’s adoption of the UCC in 1965, whenever parties to a contract create a consensual lien as security for a debt, that transaction is a secured transaction that is governed by Article 9A (formerly Article 9).
“The intent of the Legislature in enacting Article 9 of Alabama’s U.C.C. was to include all transactions in which borrowers created consensual liens [2] under the *1062 same consistent rules. Then, as now, it is the substance of the transaction and the intent of the contracting parties which determines whether a transaction is an Article 9 secured transaction or something else.”
Mattheiss v. Title Loan Express (In re Mattheiss), 214 B.R. 20, 26 (Bankr.N.D.Ala.1997), disagreed with on other grounds, Charles Hall Motors, Inc. v. Lewis (In re Lewis), 187 F.Sd 1280, 1282 (11th Cir.1998).
The forfeiture provision of the Alabama Uniform Controlled Substances Act, § 20-2-1 et seq., Ala.Code 1975, “was patterned after the proposed Uniform Controlled Substances Act recommended by the National Conference of Commissioners on Uniform State Laws.” Reeder v. State ex rel. Myers, 294 Ala. 260, 264, 814 So.2d 853, 856 (1975), questioned on other grounds, Wilhite v. State, 689 So.2d 221 (Ala.Crim.App.1996). Section 505(a)(4)(iv) of the Uniform Controlled Substances Act of 1970 provided that “[a] forfeiture of a conveyance encumbered by a bona fide security interest is subject to the interest of the secured party if he neither had knowledge of nor consented to the act or omission.” (Emphasis added.) The foregoing provision in the Uniform Act was originally codified, verbatim, as § 20-2-93(a)(4)c. Section 20-2-93 was amended in 1981, and subsection (a)(4)c. was recodi-fied as subsection (a)(5)c. See Act No. 81-413, Ala. Acts 1981 (May 5,1981). Former § 20-2-93(a)(4)c. was a verbatim enactment of the foregoing provision in the Uniform Act. In 1988, the legislature again amended § 20-2-93 by renaming it “The Drug Profits Forfeiture Act of 1988,” by rewriting, among others, subsection (a)(5), and by adding current subsection (h), see Act No. 651, § 2, Ala. Acts 1988 (effective May 13, 1988).[3] Among other changes, the 1988 amendment substituted the term “bona fide lienholder” in current subsection (h) for the term “bona fide security interest” previously used originally in subsection (a)(4)c. and subsequently in subsection (a)(5)(c).
One might assume that the term “bona fide lienholder” first appeared in Alabama forfeiture cases decided after the 1988 amendment, but the reverse is true. The first use of the term “bona fide lienholder” was in Singleton v. State, 396 So.2d 1050 (Ala.1981), a case decided before the 1988 amendment, when § 20-2-93(a)(4)c. protected persons holding “bona fide security interest[s]” from forfeiture.
Singleton and its companion case, Air Shipping International v. State, 392 So.2d 828 (Ala.1981), dealt with a huge drug-smuggling operation involving a tractor-trailer truck and a DC-6 airplane, the “Aruba Star.” After participants in the operation landed in the pre-dawn hours at a small south Alabama airfield, they backed up to the cargo doors of the plane and began unloading over four and one-half tons of marijuana. The intervenor in Singleton was a bank that had loaned money for the purchase of the truck. In recognizing the bank’s security interest, the Singleton court equated possessing that interest with being a lienholder:
“[Section 20-2-93(a)(4)c.] contemplates the forfeiture of encumbered conveyances, subject, of course, to the interests of secured parties. The clear language *1063 of the statute evidences a legislative intent to protect bona fide lienholders without destroying the right of the State to condemn a vehicle used in violation of the Controlled Substances Act.”
396 So.2d at 1055 (some emphasis added). But, the court concluded that merely being a secured party or a lienholder without knowledge of the intended illegal use of the vehicle was insufficient. The court determined that a secured party or lien-holder must demonstrate something more in order to be considered the holder of a bona fide security interest:
“[T]he holder of a bona fide security interest ... carrie[s] the burden of proving that it did not have knowledge or notice of the intended illegal use and that it could not have obtained knowledge by reasonable diligence.”
396 So.2d at 1054 (final emphasis added). In Singleton and Air Shipping, our supreme court imported the additional reasonable-diligence condition from caselaw, including Edwards v. State, 213 Ala. 122, 104 So. 255 (1925), concerning the condemnation of automobiles that had been used in the unlawful transportation of prohibited liquors.
We conclude that, when it amended § 20-2-93 in 1988, the legislature was cognizant of Singleton and did not intend, by replacing the term “bona fide security interest” with the term “bona fide lienholder,” to alter the category of persons whose interests were protected from forfeiture but, rather, intended to substitute a term that, according to Singleton, has the same meaning when used in the same context. Cf. Ala.Code 1975, § 32-8-61(b) (“A security interest [in a vehicle for which a certificate of title is required by the Alabama Uniform Certificate of Title and Antitheft Act] is perfected by the delivery to the [Department of Revenue] of the existing certificate of title, if any, an application for a certificate of title containing the name and address of the lienholder and the date of his security agreement and the required fee.” (emphasis added)).
Our assumption that the 1988 amendment to § 20-2-93 bears the marks of having been influenced by Singleton is also supported by the fact that the legislature added to the lack-of-knowledge-or-eonsent requirement in the statute the reasonable-diligence condition. Before the 1988 amendment, former § 20-2-93(a)(4)c. and, subsequently, former § 20-2-93(a)(5)c. protected the interest of a secured party in a forfeited vehicle “if [the secured party] neither had knowledge of nor consented to the [illegal] act or omission.” After the amendment, however, the legislature made that protection subject to the additional condition now found in current subsection (h): not only must the act that subjected the property to forfeiture have been “committed or omitted without the owner’s or lienholder’s knowledge or consent,” but also the owner or lienholder must have been unable to obtain “by the exercise of reasonable diligence knowledge of the intended illegal use of the property so as to have prevented such use.” Our cases after Jester have employed the terms “bona fide lienholder” and “secured party” interchangeably. See, e.g., State ex rel. Watkins v. Sellers, 894 So.2d 733, 737 n. 3 (Ala.Civ.App.2004).
In Jester, this court explained that the determination whether a security agreement exists requires a two-step inquiry:
“ ‘[T]he question of whether a security agreement is established calls for two independent inquiries which may be stated as follows:
“ ‘ “The court must first resolve, as a question of law, whether the language embodied in the writing objectively indicates that the parties *1064 may have intended to create or provide for a security agreement. [Citations omitted.] If the language crosses this objective threshold [citations omitted], that is, if the writing evidences a possible secured transaction and thus satisfies the statute of frauds requirement, then the factfinder must inquire whether the parties actually intended to create a security interest. [Citations omitted.] Parol evidence is admissible to inform the latter [citations omitted], but not the former, inquiry.”’
“J. White & R. Summers, Uniform Commercial Code, § 23-3 at 905 (2d ed.1980), as quoted in In re Owensboro Canning Co., 82 B.R. 450, 453-54 (Bankr.W.D.Ky.1988) (emphasis and brackets added by the bankruptcy court).”
Jester, 668 So.2d at 823. The first step of the inquiry — whether “the writing evidences a possible secured transaction and thus satisfies the [Article 9 (now Article 9A) ] statute of frauds requirement” — necessarily includes, as an indispensable component of a security agreement, that there be a writing. In Jester, this court did not dwell on the requirement that a security agreement be written because, in that case, the father and son had executed a written agreement that complied with the requirements of the Article 9 statute of frauds, former § 7-9-203, Ala.Code 1975 (repealed and recodified, as revised, as § 7-9A-203 by Act No. 481, § 1, Ala. Acts 2001 (effective January 1, 2002)). Moreover, the decisions from other jurisdictions upon which this court relied in Jester also involved intra-family written contracts that were determined to be security agreements. See Hallman v. State, 141 Ga.App. 527, 233 S.E.2d 839 (1977); State v. One 1979 Pontiac Trans Am, 771 P.2d 682 (Utah Ct.App.1989); and State v. Fouse, 120 Wis.2d 471, 355 N.W.2d 366 (Ct.App.1984). In the present case, however, the grandmother and the grandson had an oral agreement that the grandson would purchase the truck from the grandmother. If that oral agreement did not constitute a “security agreement,” then the grandmother could not be a “secured party” or a lienholder for purposes of § 20-2-93(h).
After conducting the two-step inquiry to determine whether the interest of the father in Jester made him a secured party, and thus a lienholder for purposes of § 20-2-93(h), this court proceeded to a third inquiry: whether one who is a lienholder qualifies as a “bona fide lienholder” whose interest is protected from forfeiture under § 20-2-93(h). We adopted the test employed by the Utah Court of Appeals in State v. One 1979 Pontiac Trans Am, supra, a case in which grandparents had loaned their grandson the funds to buy an automobile:
“ ‘To ascertain the plain meaning of the term “bona fide” we turn to Webster’s Third New Int’l Dictionary, 250 (1986), wherein “bona fide” is defined as being “made in good faith without fraud or deceit....” Similarly, Black’s Law Dictionary 160 (5th ed.1979), defines “bona fide” as “in or with good faith; honestly, openly, and sincerely; without deceit or fraud.” Accordingly, we hold that to establish a security interest is “bona fide" under the forfeiture statute, one must only establish an actual, good faith interest in the property not derived by fraud or deceit. Under this definition, the [grandparents] have a bona fide security interest in [the grandson’s] [automobile]. The [grandparents] loaned [the grandson] money towards the purchase and repair of the [automobile] and a balance of $3,883 remained due on this loan. The [grandparents] believed in good faith that [the grandson] would *1065 repay the loan and that they had a hen against the [automobile] to secure their loan. Finally, the State does not claim the [grandparents] knew of [the grandson’s] illegal use of the [automobile] to transport drugs. Based on the foregoing, we conclude the [grandparents] had a bona fide security interest within the meaning of [the Utah forfeiture statute].’ ”
Jester, 668 So.2d at 825 (quoting State v. One 1979 Pontiac Trans Am, 771 P.2d at 685) (emphasis added by this court in Jester).
The trial court’s judgment in this case states, in pertinent part:
“18. [T]he court is reasonably satisfied that the [grandmother] has demonstrated that she [was] a bona fide holder of an unperfected lien on the subject vehicle at the time of seizure. In making this determination, the court has relied upon the case of Jester v. State, 668 So.2d 822 (Ala.Civ.App.1995), for the definition of ‘bona fide lien holder,’ which defines ‘bona fide lien holder’ as a person who, before the seizure of the vehicle, had an actual, good faith interest in the property not derived by fraud or deceit ... and one who had no actual knowledge or constructive knowledge of [the] intended illegal use of the vehicle. There was no evidence of fraud or deceit on the part of the [grandmother] or that the [grandmother] had knowledge or constructive knowledge of the intended illegal use.
[[Image here]]
“23. ... [T]he Court is reasonably satisfied that the [the grandson] and [the grandmother] intended to provide a security interest in the subject vehicle as evidenced by the sales agreement, possession delivered to the [grandson] and [the grandson’s] payments made in furtherance of the agreement.
“24. ... [T]he actions of the [the grandson] and [the grandmother] removed this transaction from the Statute of Frauds, as possession of the subject vehicle was placed in the [grandson] by the [grandmother] and money was paid by the [grandson] toward the purchase and the same was accepted by the [grandmother],
“25. ... [T]he Court is satisfied the [grandmother] has an unperfected security lien in the subject vehicle in the amount of $10,774.50, derived by subtracting the sum of $3,900.00 (money paid by the [grandson]) from the sum of $14,674.50 (the sum paid by the [grandmother] for the purchase of the truck to Superior Chevrolet).”
Although the trial court cited Jester, it appears not to have undertaken the two-step inquiry set out in that case for determining whether the grandmother was “a secured party within the meaning of Article 9 [now Article 9A] of the U.C.C. and thus, necessarily, was a ‘lienholder’ within the meaning of Ala.Code 1975, § 20-2-93(h).” See Jester, 668 So.2d at 825. Instead, the trial court apparently assumed that the grandmother was a “secured party” or “lienholder” and then proceeded immediately to the determination that she was a “bona fide lienholder” because she “had ‘an actual, good faith interest in the property not derived by fraud or deceit’ and [was] one who had no actual or constructive knowledge of the intended illegal use of the vehicle.” Id. at 825-26. In omitting the inquiry as to whether the grandmother was, in the first instance, a secured party and thus a lienholder, the trial court erred as a matter of law.
The attachment and enforceability of a security interest is governed by § 7-9A-203, which was adopted contemporaneously with the 2002 repeal of former Article 9; that section provides, in pertinent part:
*1066 “(a) Attachment. A security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones the time of attachment.
“(b) Enforceability. Except as otherwise provided in subsections (c) through (i), a security interest is enforceable against the debtor and third parties with respect to the collateral only if:
“(1) value has been given;
“(2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and
“(3) one of the following conditions is met:
“(A) the debtor has authenticated a security agreement that provides a description of the collateral and, if the security interest covers timber to be cut, a description of the land concerned;
“(B) the collateral is not a certificated security and is in the possession of the secured party under Section 7-9A-B13 pursuant to the debtor’s security agreement;
“(C) the collateral is a certificated security in registered form and the security certificate has been delivered to the secured party under Section 7-8-301 pursuant to the debtor’s security agreement; or
“(D) the collateral is deposit accounts, electronic chattel paper, investment property, or letter-of-credit rights, and the secured party has control under Section 7-7-106, 7-9A-104, 7-9A-105, 7-9A-106, or 7-9A-107 pursuant to the debtor’s security agreement.”
(Emphasis added.)
“Authentication,” as referenced in § 7-9A-203(b)(3)(A), means either “to sign” or “to execute or otherwise adopt a symbol, or encrypt or similarly process a record....” Ala.Code 1975, § 7-9A-102(a)(7)(A) & (B). The Official Comment to § 7-9A-102 explains that the term “authenticate” generally replaces the language in former § 7-9-203(l)(a), requiring debtors to “sign” a written security agreement so as to include authentication of all records, including intangible computer-generated records and not just tangible writings, within the concept of a security agreement. Ala.Code 1975, § 7-9A-102 cmt. 9(b). But it is clear that some form of writing or record is required in order to satisfy the statute of frauds applicable to Article 9A (formerly Article 9). See Ala. Code 1975, § 7-9A-203 cmt. 3 (explaining that “enforceability requires the debtor’s security agreement and compliance with an evidentiary requirement in the nature of a Statute of Frauds”).[4]
“The sine qua non of a security agreement” is a writing demonstrating “to an objective observer, that [a] debtor intended to transfer an interest in personal property as security to a creditor.” 4 James J. White & Robert S. Summers, Uniform Commercial Code § 31-3 (6th ed.2010). See Ex parte People’s Cmty. Bank of Ashford, 775 So.2d 819, 823 (Ala.2000) (stating that, “[bjecause there is no evidence in the record of a signed security agreement ..., the [party claiming to have a security interest in proceeds from the sale of crops] has no specifically enforceable claim against the disputed proceeds.... ”); General Elec. Credit Corp. v. Strickland Div. *1067 of Rebel Lumber Co., 437 So.2d 1240, 1245 (Ala.1983) (stating that, “[s]ince the agreement was oral, it was not enforceable as a security agreement,” and citing McDonald v. Peoples Auto. Loan & Fin. Corp. of Athens, 115 Ga.App. 483, 487, 154 S.E.2d 886, 889 (1967) (stating that, “ ‘[ujnless the secured party is in possession of the collateral, his security interest, absent a writing which satisfies [§ 109A-9-203(l)b., Ga. Code Ann.], is not enforceable even against the debtor, and cannot be made so on the theory of equitable mortgage or the like’ ” (quoting § 109A-9-203, Ga.Code Ann., Official Comment))). See also Hoc, Inc. v. McAllister (In re McAllister), 215 B.R. 217, 225 (Bankr.N.D.Ala.1996) (stating that, “[u]nder the applicable portions of [former] Ala.Code 1975, § 7-9-203(1), a security agreement is enforceable if (a) the debtor has signed a written security agreement, (b) value has been given by the secured party for the security interest and (c) the debtor has acquired rights in the collateral”); First Nat’l Bank of Baldwin Cnty. v. Taylor (In re Modern Mix, Inc.), 18 B.R. 746, 748 (Bankr.S.D.Ala.1982) (stating that “[a] claimed security interest without a security agreement describing the collateral which is given as security is unenforceable” (citing former § 7-9-203)).
The trial court apparently assumed that our reference in Jester to the “statute of frauds” necessarily indicated § 8-9-2, Ala.Code 1975, the general Alabama Statute of Frauds, rather than § 7-9A-203(b)(3)(A), the statute of frauds applicable to transactions subject to Article 9A, which establishes the requirement that a security interest be evidenced by a writing or a record, because in Paragraph 24 of its judgment the trial court purported to apply a possession-and-partial-performance exception to the writing requirement. However, to the extent that there may exist a “possession” exception to the writ-tag requirement of § 7-9A-203, possession must be in the secured party, not the debtor. See McDonald v. Peoples Auto. Loan & Fin. Corp. of Athens, supra, and note 4 supra.
To the extent that the trial court may have assumed that § 8-9-2(7), Ala. Code 1975, applied to the agreement between the grandmother and the grandson, it was mistaken. That section provides:
“In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:
[[Image here]]
“(7) Every agreement or commitment to lend money, delay or forbear repayment thereof or to modify the provisions of such an agreement or commitment except for consumer loans with a principal amount financed less than $25,000.”
Section 8-9-2(7) does not apply to an agreement to repay money already lent; it applies to a commitment to lend money. See Page v. Gulf Coast Motors, 903 So.2d 148 (Ala.Civ.App.2004), and Rozell v. Childers, 888 So.2d 1244 (Ala.Civ.App.2004).
We now make explicit what was implicit in Jester: that, for purposes of forfeiture actions brought under § 20-2-93, an tatervenor who asserts an interest in a vehicle that would be governed by Article 9A (formerly Article 9) of the UCC must necessarily be a “secured party.”
The dissent takes us to task for creating legal arguments for the State by citing various provisions of Article 9A and former Article 9 and by delving into the legislative history of § 20-2-93 when the State has failed to do either. The State, *1068 however, cites Jester, the decision upon which the trial court relied, and argues that the grandmother
“did nothing to secure her interest in the ... truck. She did not have a written contract with [the grandson] and she was not listed on the title. [The grandmother] only provided evidence that she provided the initial funds to purchase the vehicle, and she later decided to sell the truck to [the grandson]. This was not enough to perfect a security interest in the property or to establish ownership.”
State’s brief, at 9 (emphasis added). In response, the grandmother, also relying on Jester, argues:
“Indeed, the trial court expressly determined that [the grandmother’s] interest in the truck was ‘unperfected.’ However, the trial court’s determination that the [grandmother] had an unperfected security interest in the subject vehicle was supported by substantial evidence at trial.”
Grandmother’s brief, at 15 (emphasis added). Both parties cite Jester in support of their positions, and the trial court’s judgment relied on Jester. When the parties and the trial court all rely on the same precedent, and they all misconceive the import of that precedent, then an appellate court does a disservice to the bench and bar by avoiding the issue and failing to correct the misconceptions under the guise of Rule 28, Ala. R.App. P.
“[T]his court may choose to affirm a case on the basis of Rule 28 when an appellant’s brief fails to comply with the rule, but this court is by no means required to do so. See Kirksey v. Roberts, 618 So.2d 352, 358 (Ala.1993); Bishop v. Robinson, 516 So.2d 723, 724 (Ala.Civ.App.1987); and Thoman Eng’rs, Inc. v. McDonald, 57 Ala.App. 287, 289, 328 So.2d 293, 295 (1976). The decision is a matter of discretion, and considerations other than compliance with the rule are integral to the exercise of that discretion. Among those other considerations are whether the argument ‘has been raised in a manner which is fair to all concerned,’ McDonald, 57 Ala.App. at 290, 328 So.2d at 294; whether the ap-pellee adequately responds to the issues raised by the appellant in brief despite the noncompliance, Bishop, 516 So.2d at 724; whether the court is able to adequately discern the issues presented, Kirksey, 613 So.2d at 353; and the emphasis placed by the Rules of Appellate Procedure on reaching the merits of our cases. McDonald, 57 Ala.App. at 289, 328 So.2d at 295. In light of these considerations, we choose to address the merits of the [State’s] appeal despite the deficiencies of [its] brief.”
Dubose v. Dubose, 964 So.2d 42, 46 n. 5 (Ala.Civ.App.2007).
To be clear, perfection is not at issue in this case, nor was it at issue in Jester. We are not concerned with whether the grandmother was a perfected secured party; rather, we are concerned with whether she was, in the first instance, a secured party. We conclude that she was not and that the trial court erred as a matter of law in holding otherwise.

Conclusion

The trial court correctly concluded that the grandson’s interest in the truck was due to be forfeited to the State under § 20-2-93(a)(5). However, the trial court erred in concluding that the grandmother was a bona fide lienholder whose interest in the truck was protected from forfeiture by § 20-2-93(h). Because the oral agreement between the grandmother and the grandson did not constitute a security agreement under § 7-9A-203(b)(3)(A), the grandmother was not a secured party within the meaning of § 7-9A- *1069 102(a)(72)(A) and, therefore, was not a “lienholder” within the meaning of § 20-2-93(h).
The judgment is reversed insofar as it requires satisfaction of the grandmother’s interest in the truck, and the cause is remanded for the rendition and entry of a judgment in favor of the State.
REVERSED AND REMANDED.
THOMAS, J., concurs.
THOMPSON, P.J., concurs in the result, without writing.
BRYAN, J., dissents, without writing.
MOORE, J., dissents, with writing.

. Effective January 1, 2002, Article 9 of the UCC, entitled "Secured Transactions; Sales of Accounts and Chattel Paper,” was repealed and replaced by Article 9A, entitled "Secured Transactions.” See Act No. 481, § 1, Ala. Acts 2001.

2. Article 9A (formerly Article 9) does not govern the creation of nonconsensual liens that *1062 arise by operation of law, such as judgment liens and various statutory liens for services or materials, see Ala.Code 1975, § 7-9A-109(d)(2), but it does apply with respect to the priority of such liens, see Ala.Code 1975, § 7-9A-333.

. Section 20-2-93 has been amended multiple times. We discuss only those amendments that are pertinent to our analysis.

. The only exceptions to the authenticated-writing requirement of § 7-9A-203(b)(3)(A) are found in subparagraphs (b)(3)(B), (C), and (D) of § 7-9A-203 — instances in which the secured party retains the collateral in its possession or under its control.