Argued at Pendleton October 26; affirmed December 7, 1937

# PACIFIC WOOL GROWERS *v.* DRAPER & CO., INC., ET AL.

## (73 P. (2d) 1391)

In Banc.

*Arthur A. Goldsmith*, of Portland (Jaureguy & Tooze, or Portland, on the brief), for appellant.

*George T. Cochran*, of La Grande (Cochran & Eberhard, of La Grande, on the brief), for respondents.

BELT, J. This is an action by the Pacific Wool Growers, a co-operative marketing association, against Draper & Co., Inc., a Boston wool dealer, and its agent, John J. Kelly, to recover compensatory damages of $26,022.48, and punitive damages of $17,000 for the alleged wrongful and malicious conversion of wool. The plaintiff's claim of ownership and right to possession of the wool is based upon a co-operative marketing contract executed between the association and the seven grower members from whom Draper & Co purchased the wool in May, 1935. There is no dispute about the execution of the contracts of the amount of wool purchased. The complaint sets forth four causes of action. The first involves the wool produced by Fred Phillips, who executed the standard marketing agreement with the plaintiff association on February 19, 1933. The second involves the wool produced by Noble Holcomb, John W. Densley, Tom Densley, and W. J. Densley, grower members of the association. The third

concerns the wool grown by Walter S. Saunders, and the fourth that produced by W. E. Farley. The growers mentioned in the second, third, and fourth causes of action executed standard marketing agreements with the plaintiff association on March 15, 1934. The wool involved in all the causes of action was the 1935 clip and was purchased by Draper & Co. at market value from the grower members while in their possession in Baker county and shipped to Boston. Demand made by the association upon Draper & Co. for a return of the wool was refused.

The theory of the plaintiff is that, under and by virtue of the marketing agreements executed by the grower members, absolute title to the wool in question was vested in it prior to and at the time Draper & Co. purchased it and that the intent or good faith of the purchaser is immaterial except insofar as punitive damages are concerned. Plaintiff further contends that Draper & Co. knew of the contractual relations of the grower members with the co-operative association at the time the wool was purchased and that, therefore, its interference was tortious and malicious. It is conceded that the marketing agreements were not recorded and that the wool in controversy never came into possession of the plaintiff association.

Defendants contend: (1) That at the time the wool was purchased by Draper & Co. the co-operative association had not acquired title to the same under and by virtue of the marketing agreements, or otherwise; (2) that the wool which defendants purchased was not in existence or produced by sheep owned by the grower members at the time the marketing agreements were executed; (3) that the wool was purchased in good faith and for value without actual or constructive knowledge of any right or interest of the association in the same;

(4) that, under the terms of the marketing agreement, all wool, including the 1935 clip, was excluded from the operation thereof for the reason that, at the time the contracts were executed, the wool was encumbered by mortgages; and (5) that the association, by reason of its conduct and representations, should be estopped from asserting that the grower members did not have the right to sell the wool to Draper & Co.

The cause was submitted to the court, without a jury, and, based upon certain findings of fact and conclusions of law, all causes of action were dismissed as against the defendants John J. Kelly and Draper & Co., Inc. Plaintiff took a judgment of voluntary nonsuit as to the defendant Charles I. Tuttle for the reason that no service was had against him and he made no appearance. Plaintiff appeals.

The essential elements of plaintiff's causes of action are: (1) That plaintiff was the owner and entitled to immediate possession of the wool at the time it was purchased by Draper & Co. from the grower members of the association; (2) that the defendants converted the wool in controversy to their own use and benefit; and (3) that plaintiff sustained damage by reason of the alleged wrongful act of the defendants.

Plaintiff's claim of ownership is based upon the co-operative marketing contracts. There are many difficult and perplexing problems involved in this case—especially as to whether an absolute title to wool having a potential existence passed to the association when it actually came into existence, but, in view of the conclusions reached, it will not be necessary to consider the same. It will be assumed, without so deciding, that such title did pass as between the association and its grower members. It does not follow, however, that the passing of title as between the parties to the co-operative agree-

ment is conclusive as against subsequent bona fide purchasers. Neither does such passage of title preclude the defense of equitable estoppel.

It is apparent that the association and Draper & Co. each claims to have deraigned title from the same common source. Plaintiff relies upon the co-operative marketing agreements. Draper & Co. relies upon its rights as a bona fide purchaser for value and without notice of the alleged previous sale and also upon the principle of estoppel.

■■ The trial court, in reference to the Phillips wool, found that the defendants or either of them had no notice or knowledge of any interest or claim of the plaintiff to such wool at the time Draper & Co. purchased the same for full value. The findings of the court are equivalent to those of a jury and, if there is any substantial evidence to support the same, are conclusive. On such issue of fact it is not the province of this court to substitute its judgment for that of the lower tribunal. This court can interfere only when there is no substantial evidence to support the judgment. In the instant case, there is ample evidence that Draper & Co. had no notice or knowledge of any interest the association may have had in the Phillips wool. Phillips told Kelly, the buyer for Draper & Co., that his wool was not "tied up" with the association and that, although he was a director of the association, he was free to sell. Kelly, in response to the question "Did you make any inquiry of him (Phillips) as to whether or not he still had a contract with the Pacific?" testified, "He told me that he had withdrawn from the Pacific; and that he wanted to sell his wool and realize some cash."

■ We think section 64-409, Oregon Code 1930—which is section 25 of the Uniform Sales Act—applies and is

decisive relative to the question of title. It provides as follows:

"Where a person having sold goods continues in possession of the goods, or of negotiable documents of title to the goods, the delivery or transfer by that person, or by an agent acting for him, of the goods or documents of title under any sale, pledge, or other disposition thereof, to any person receiving and paying value for the same in good faith and without notice of the previous sale, shall have the same effect as if the person making the delivery or transfer were expressly authorized by the owner of the goods to make the same."

In construing the above section, this court, in *Wheeler Lmbr. Co. v. Shelton*, 146 Or. 550 (29 P. (2d) 1013, 31 P. (2d) 163), said:

"This section is part of the Uniform Sales Act and refers to sales. It specifically applies where a person having sold goods continues in possession of the same and thereafter sells the same to another person receiving and paying value thereof in good faith and without notice of the previous sale. This section is obviously designed to prevent innocent people from being defrauded by purchasing personal property from one in possession claiming to be the owner."

██ Phillips owned the sheep and had all the indicia of ownership of the wool. There was nothing of record to indicate any interest of the plaintiff association in the wool. Can it be that, under such circumstances, a bona fide purchaser deals at his peril? The rule seems to be well settled that where the same thing is sold to two different persons by contracts equally valid, the bona fide purchaser who first acquires possession of the property is entitled to the same: 24 R. C. L. 49; 55 C. J. 643; *Patchin v. Rowell,* 86 Conn. 372 (85 Atl. 511). Some courts seem to place a limitation on the rule by permitting the first buyer a reasonable time to obtain pos-

session of the property, but it is believed that such limitation is contrary to the purpose and spirit of the sales act. While the co-operative marketing act of this state was enacted subsequent to the sales act, certainly the legislature did not intend to repeal the prior act concerning the rights of bona fide purchasers.

Appellant relies strongly upon *Velsian v. Lewis,* 15 Or. 539 (16 P. 631, 3 Am. St. Rep. 184), and the kindred cases of *Walker v. First National Bank,* 43 Or. 102 (72 P. 635), and *Sabin v. Chrisman,* 90 Or. 85 (175 P. 622), but we think the rule stated therein has no application to the facts in this case. Here we are concerned with a case where the owner of wool sold the same to appellant and subsequently sold it to another person while it still remained in possession of the seller. In the Velsian case the plaintiff therein sold and delivered his wheat to one Owens to be paid for in cash on delivery. Owens, while the wheat was in a warehouse operated by one Dillard, sold the same to defendant without paying the plaintiff. Under such factual situation, judgment for plaintiff in an action for conversion was sustained, the court holding that the good faith of the defendant was not material and that Owens, not having good title to the wheat, could not transfer one to the defendant. If Owens had been the owner of the wheat and had first sold to A and later, while still retaining possession of the same, had sold to B, a bona fide purchaser, a different rule would have obtained.

What has been said thus far pertains to the purchase of the Phillips wool. A somewhat different situation exists relative to the purchase of the wool from the other grower members. Such wool was pooled under the designation of the "Robinette pool," and reference to it hereafter will be so made.

■ It is clear that before Draper & Co. purchased the Robinette wool it knew, through its agents, that the woolgrowers with whom it was dealing had executed some kind of co-operative marketing agreement with the plaintiff association. Having such knowledge, it was incumbent upon Draper & Co. to make further inquiry as to the contractual relations of the parties, unless by some act or word of the plaintiff association it was induced not to do so and was thereby lulled into a false sense of security.

■ At the time all the marketing contracts were executed, the wool included therein was encumbered by mortgages in favor of the Regional Agricultural Credit Corporation. These government mortgages were renewed from year to year and, with the exception of that on the Phillips wool, existed at the time of the alleged conversion. Although the plaintiff now claims that absolute title to the wool passed to it by virtue of the marketing agreements, it is conceded that, during the years 1933 and 1934, the wool, pursuant to an agreement between the plaintiff and the federal government, was handled by the association under consignment. In other words, the wool was not handled in accordance with the provisions of the marketing agreements but the association and the grower members acted under the regulations of the government in the marketing and sale of the wool. Government financed wool was, during such years, handled on consignment by the plaintiff who acted as a broker or wool merchant. Plaintiff never made any pretense of ownership in the wool.

The terms and conditions superimposed by the government upon the association and its grower members had materially altered their contractual relations. That the status of the parties had become confused and uncertain is manifested by the letter of the Federal In-

termediate Credit Bank of Spokane to the plaintiff, under date of May 6, 1933, wherein, among other things, it is stated:

"In this arrangement (referring to contract between the bank and the association) the status of the grower, and likewise that of the discount company and/or Credit Bank holding the lien on his wool, is a bit confusing to us, providing he executes both your standard form marketing agreement and the consignment contract. Under the terms of the Marketing Agreement, he is obligated to pay marketing costs in your association, and under the terms of the consignment agreement is liable for a commission of two cents per pound plus. I am sure it is not your thought that he should pay anything but the two cents on consigned wool, and for that reason we fail to see the practical need for the marketing agreement. In this set-up your cooperative, strictly speaking, becomes a wool merchant, governed by the terms of the agreement which it executes with the bank."

It is true that the federal government by Bulletin No. 172, dated March 23, 1935, cancelled the regulation requiring the wool to be consigned to approved dealers and permitted the growers to sell government financed wool. We think, however, that the manner of dealing with wool under consignment in the years 1933 and 1934 was admissible under the issue of estoppel relative to sale of wool in 1935. It is quite apparent that the growers in 1935 did not know whether they were "in" or "out" of the association. It was under this state of confusion resulting from government regulation that Draper & Co. dealt with the growers in May, 1935.

■ On May 15, 1935, Kelly, as agent for Draper & Co., had a telephone conversation with Ward, general manager of the co-operative association, relative to the right of the growers to sell to his company. With reference to this conversation, which occurred after the sale

of the Phillips wool, the record discloses the following, according to the version of the plaintiff:

"Mr. Kelly: * * * In case they should sell what would happen?

"Mr. Ward: We would have to get the Association 1c per pound above it. * * *

"Mr. Ward: But the continuing contracts provide that the wool must be delivered to the Association. If they sell outside without the Association's consent we are entitled to 1c a pound to go towards * * *

"Mr. Kelly: This is our position. We want to buy the wool. I want to buy that wool very much. The boys want to sell but they are not sure whether or not they are free to sell.

"Mr. Ward: They are not free to sell John. *Of course if you want to pay 1c more than you offered, that would permit them to sell.*" (Italics ours.)

In reference to the same conversation, Kelly testified as follows:

"Q. What conversation did you have?

"A. I told them I was dealing on the Robinet wool.

"Q. What did he say?

"A. He says, *the Robinet boys have consigned their wool to us,* and we will sell it to you next winter * * * (Italics ours.)

&ast; &ast; &ast; &ast; &ast; ·

"Q. State whether or not in that conversation the Pacific Wool Growers claimed to own the wool?

"A. No, they never claimed to me to own it; they said the Robinet boys have consigned their wool to the Pacific.

"Q. State whether or not in that conversation with you anything was said about a contract.

"A. No.

&ast; &ast; &ast; &ast; &ast;

"A. He said he would penalize the Robinet boys if they sold the wool.

"Q. State whether or not there was anything said about any penalty to Draper & Co.

"A. No, nothing.

*      *      *      *      *

"Q. State whether or not you had any notice or knowledge of any ownership of the Pacific or any terms of the contract other than this telephone conversation at all until after the wool was bought.

"A. No, not until after it was bought."

■ ■ From the above conversation we think the court might well have drawn the reasonable inference that the association had no objection to a sale by the growers to Draper & Co., provided the association received 1 cent a pound as liquidated damages. At no time did the association claim absolute title to the wool. In view of this conversation, Draper & Co. was not obliged to seek out the contract to ascertain the right of the grower to sell. The association could not say to Draper & Co., "Of course if you want to pay 1c more than you offered, that *would permit them to sell*," and, after the sale was made, assert that it was in violation of a marketing agreement, the particular terms of which were unknown to the defendants. Draper & Co. had the right to rely upon what Ward, the general manager, said about the right of the growers to sell, even though the co-operative marketing contract did not so provide. In our opinion, there is evidence tending to show that the association is estopped to assert that its grower members did not have authority to sell their wool to Draper & Co. An issue of fact was presented to the trial court and, since there is substantial evidence to support its findings in reference thereto, this court will not interfere, although it might have drawn a different inference from the telephone conversation.

The judgment of the lower court is affirmed.

Rossman and Kelly, JJ., not sitting.