**In re Lisa Marie MATTHEISS, Debtor.**

**Lisa Marie MATTHEISS, Plaintiff,**

**v.**

**TITLE LOAN EXPRESS, and C. David Cottingham, as Chapter 13 Trustee, Defendants.**

**Bankruptcy No. 97–70642–CMS–13.**
**Adversary No. 97–70088.**

United States Bankruptcy Court,
N.D. Alabama,
Western Division.

Oct. 20, 1997.

W. Cameron Parsons, Tuscaloosa, AL, for Debtor/Plaintiff.

Jeffrey L. Ingram, John Martin Galese, Birmingham, AL, for Creditor/Defendant.

C. David Cottingham, Tuscaloosa, AL, for Chapter 13 Standing Trustee.

W. McCollum Holcomb, Birmingham, AL, for Trustee.

*MEMORANDUM OF DECISION*

C. MICHAEL STILSON, Bankruptcy Judge.

This matter came before the court on debtor Lisa Marie Mattheiss' complaint for turnover of the title documents to her automobile filed against creditor Title Loan Express (TLE) and for avoidance of the lien Title Loan claimed on her vehicle; and on Chapter 13 Trustee C. David Cottingham's *Cross-Claim and Counterclaim* seeking to void the lien for the benefit of creditors. The court has studied the facts as stipulated by the parties and the records of the transactions. The court finds that Mattheiss "title loan" transaction is governed by Article 9 of the Uniform Commercial Code and the Uniform Certificate of Title and Antitheft Act as well as the Alabama Pawnshop Act; that Mattheiss' rights in the vehicle became property of the bankruptcy estate when she filed her petition March 5, 1997; that TLE failed to perfect its security interest in Mattheiss' car before the 90-day preference period prior to bankruptcy; and, therefore, the Chapter 13 trustee may avoid the transfer of the security interest under 11 U.S.C. § 547(b). However, transfer was voluntary and pursuant to 11 U.S.C. § 522(g), cannot be avoided by the debtor under § 522(f). Therefore, TLE's claim is only secured by the certificate of title in its possession and Mattheiss is not entitled to an order that TLE turn over the certificate of title with its lien shown paid in full. To the extent of this Memorandum, judgment is to be entered in **FAVOR** of the Plaintiff Lisa Marie Mattheiss; and in **FAVOR** of the trustee on his *Cross-claim and Counterclaim;* and **AGAINST** defendant Title Loan Express of Northport, Alabama and **AGAINST** the debtor plaintiff on the Section 522(f) issue.

## FINDINGS OF FACT

The critical facts in this case involve the timetable of debtor Lisa Marie Mattheiss' pawn transaction with Title Loan Express of Northport, Ala., and her subsequent bankruptcy filing. These facts are not in dispute and are recorded in a stipulation reached by the parties at an April 25, 1997 hearing. The dispute concerns the application of Alabama state and federal bankruptcy law to these facts. The stipulated facts are as follows:

Mattheiss entered into a "**PAWN TICKET CONTRACT AND DISCLOSURE/RECEIPT**" with the pawnbroker December 19, 1996. The form contract identified Mattheiss as the "pledgor" and identified the "Pledged Goods:" as "(The following described motor vehicle and the certificate of title as issued by the Motor Vehicle Department.)" Lower in the document, the 1992 Mercury Sable was listed under "Item(s) Pledged". Under the terms of this contract, she granted "a possessory security interest in the items pledged to secure repayment".

The debtor delivered physical possession of the certificate of title to her 1992 Mercury Sable to Title Loan Express ("TLE") at that time and received $1,400.00 in loan proceeds. However, she retained possession of the car itself. Mattheiss' schedules valued the car at

$7,725.00. TLE claimed a lien for $2,100.00. (Proof of Claim No. 1)

The pawn contract provides for a "maturity date" of February 17, 1997, with a finance charge (called a "Monthly Pawn Charge Rate") of 25 percent per month beginning after the first 30 days of the loan. That added $350.00 to Mattheiss $1400.00 indebtedness for the second 30 days, at an annualized "Pawn Charge" percentage rate of 275%.

The contract also stated (Debtor's Exhibit 1) that:

> This is a pawn transaction. You are not obligated to repay any amount, but if you do not pay the total, you will lose your ownership rights *to the items being pledged. (We have a possessory security interest in the item(s) pledged to secure repayment.)* This pawn transaction has *a grace period of 30 calendar days following the maturity date of the transaction.* In the event the last day of the grace period falls on a day in which the pawnbroker is not open for business, the grace period shall be extended through the first day following upon which the pawnbroker is open for business. The pawnbroker shall not sell the pledged goods during the grace period. Payment must be made on time. *Pledged goods may be redeemed by the pledgor or seller within the grace period by the payment of any unpaid amount due at maturity and additional charges not to exceed 25% of the principal.* If you do not redeem the pledged goods before the expiration of the grace period and we do not agree to re-pawn the transaction, *the pledged goods become the property of the pawnbroker*.... (emphasis added)

The contract also states:

> The following information applies only to pawn transactions involving motor vehicles (sic) certificate of title:
>
> Failure to make your payment as described in this document can result in the loss of your motor vehicle.
>
> The pawnbroker has the right upon default to take possession of the motor vehicle. In taking possession, the pawnbroker or his agent may proceed without judicial process if this can be done without breach of the peace or may proceed by action.

Mattheiss had made no payments by the February 17, 1997 maturity date and TLE repossessed the car March 4, 1997 before the 30-day grace or redemption period had run. February 28, 1997, the parties agreed TLE applied to the Alabama Department of Motor Vehicles for a title showing it as lienholder on this automobile.

March 5, 1997, the debtor filed this Chapter 13 case (BK 97–70642) and this lawsuit seeking turnover of the car (AP 97–70088). After the suit was filed, TLE voluntarily returned the car to Mattheiss on March 14, 1997, but not the certificate of title documents. On March 19, 1997, the 30-day grace period under the terms of the pawn ticket agreement expired.

April 15, 1997, TLE filed an objection to confirmation of Mattheiss' proposed Chapter 13 plan. (BK Doc. 3) The plan proposed to treat the pawnbroker as an unsecured creditor to be paid pro-rata with other unsecured creditors. The objection stated:

> ... That plan improperly treats Title Loan Express as a creditor and retains an automobile in the estate that is the sole property of Title Loan Express. In the alternative, Title Loan Express as a properly secured creditor, is entitled to entry of an order granting it a fixed payment at an appropriate rate of interest....

Additionally on April 15, 1997, TLE filed a MOTION TO DECLARE PROPERTY NOT PROPERTY OF THE ESTATE. (BK Doc. 4) Essentially, the motion claimed alternative reliefs: (1) that despite Mattheiss' bankruptcy filing March 5, 1997, ownership of the vehicle vested in the pawnbroker when the grace period ran out March 19, 1997 by operation of *Ala.Code* § 5–19A–6, a section of the 1992 Alabama Pawnshop Act; or (2) that its filing of its application to be listed as a lienholder on the vehicle's certificate of title on February 28, 1997 had "perfected" its interest in the car.

Decision on Mattheiss' confirmation, and on TLE's objection to confirmation and motion to have the car declared not property of

the estate have been continued pending resolution of the similar and/or identical issues raised in this adversary proceeding.

In the suit, the debtor initially requested turnover of the vehicle and "if Title Loan Express does not have a properly perfected lien upon the title to said vehicle, that the title be returned to Debtor." (AP Doc. 1)

Mattheiss amended her complaint March 28, 1997 to state that since TLE's action to perfect a security interest in the car had fallen within the 90-day preference period of the March 5, 1997 bankruptcy, any claimed lien should be voided and that TLE be required to return the title documents to the debtor with "all liens marked 'paid in full' ". If TLE refused to do so, the debtor asked the court to order the Alabama Department of Revenue to issue a new title to Mattheiss "free and clear of all liens." (AP Doc. 6)

In an answer filed April 15, 1997, TLE denied it perfected its security interest in the car within the 90-day preference period of 11 U.S.C. § 547. (AP Doc. 8)

On April 24, 1997, Mattheiss moved to join Chapter 13 Standing Trustee C. David Cottingham, Esq., as an "indispensable" defendant in the proceeding. (AP Doc. 9) (This court granted that motion to add Cottingham as a defendant on May 8, 1997. (AP Doc. 11)).

On April 25, 1997, the parties appeared for hearing on this case and submitted the facts stipulated above for the court's consideration. The court then set a briefing schedule for Mattheiss, TLE and the trustee.

July 11, 1997, the trustee filed his *ANSWER, CROSS-CLAIM AND COUNTERCLAIM,* (AP Doc. 16). In his cross-claim and counterclaim on behalf of the Mattheiss' bankruptcy estate and her unsecured creditors, the trustee contended that since TLE's filing of its title application on February 28, 1997 was outside the 20-day "relation-back" period allowed by *Ala.Code* § 32–8–61 (1975), the perfection attempt fell within the 90-day period prior to bankruptcy and the claimed security interest could be avoided. Cottingham asked the court for an order "declaring void the security interest granted by Debtor Lisa Marie Mattheiss to Defendant Title Loan Express."

Mattheiss (AP Doc. 14), TLE (AP Doc. 15), and the trustee (AP Doc. 17) had all filed their initial briefs by July 11, 1997. On July 21, 1997, TLE filed a reply brief primarily responding to the trustee's cross- and counterclaims; and brief. Mattheiss filed her ***REPLY BRIEF OF PLAINTIFF*** on July 24, 1997. The court took this issue under submission for a decision on the agreed stipulation of facts and on the pleadings July 24, 1997.

## CONCLUSIONS OF LAW

This court has jurisdiction of Lisa Marie Mattheiss' Chapter 13 case under 28 U.S.C. § 1334(a). The court has jurisdiction of this adversary proceeding, a core proceeding under 28 U.S.C. §§ 157(b)(2)(B), (E), (F) and (K), pursuant to 28 U.S.C. § 1334(b). Such jurisdiction is conveyed to this Bankruptcy Court by the Standing Order of Reference of the United States District Courts for the Northern District of Alabama.

### I.

### *Title pawn transactions are U.C.C. Article 9 secured transactions requiring compliance with the Article 9 rules for both attachment and perfection.*

#### A. The Alabama Supreme Court has not addressed the question of whether loans on automobiles pursuant to the Alabama Pawnshop Act are also Uniform Commercial Code Article 9 secured transactions requiring perfection by either possession or title pursuant to the Alabama Uniform Certificate of Title and Antitheft Act.

Neither *Floyd v. Title Exchange and Pawn of Anniston, Inc.,* 620 So.2d 576 (Ala. 1993) nor the subsequent *Blackmon v. Downey,* 624 So.2d 1374 (Ala.1993), the only two state Supreme Court cases on Alabama's relatively new pawnshop act, address the question of perfection of security interests in automobiles granted pawnbrokers to secure small loans. In fact, the cases do just the opposite. They emphasize their narrow na-

ture and the fact that they *do not* address perfection.

The more important case, *Floyd v. Title Exchange and Pawn of Anniston, Inc.*, was about how much finance charge pawnbrokers levy on customers in "title pawn" loans in context of the new pawnshop law as opposed to the state Small Loan Act. As noted by Justice Maddox at 620 So.2d at 578, n. 4:

> The Small Loan Act permits an interest rate of either two or three percent per month, depending on the amount of the unpaid balance, § 5–18–15(a), whereas the Pawnshop Act permits a charge of 25% of the principal amount per month.

Prior to the May 21, 1992 effective date of the Alabama Pawnshop Act (Act 92–597, codified at *Ala.Code* § 5–19A–1 et. seq.), supervisors of the Bureau of Loans of the Alabama State Banking Department had attempted to enforce Small Loan Act licensing and finance charge limits on the growing "title pawn" business. Following passage of the pawnshop act, Title Exchange and Pawn of Anniston, Inc. sued Robert K. Floyd, supervisor of the Bureau of Loans of the State Banking Department, seeking a declaratory judgment that title pawn transactions on autos were not prohibited by the new law.

The trial court held that a transaction in which a customer left his auto title with a pawnbroker while keeping his car could be a pawn transaction in the meaning of the new Alabama Pawnshop Act. Supreme Court Justice Maddox, writing for the majority, affirmed that decision, inserting in his decision language from the Calhoun County Circuit Court decision that possession of the title document was "at least 'constructive possession' of the automobile."

It appears that both the trial court and the Supreme Court used that term, "constructive possession", only in the context of whether the transaction was covered by the Pawnshop Act—allowing the pawnbroker to charge the 25% monthly "pawn charge" (annualized to 300%) authorized by the new act, or being governed by the Small Loan Act's licensing and interest limits.

This court cannot agree with an opinion in the United States Bankruptcy Court for the Middle District of Alabama that *Title Exchange* held that "a pawnshop customer can give constructive possession of an automobile to another while the customer retains actual physical possession" and that such "constructive possession" can perfect a "possessory" security interest in the car itself. *See In re Jones,* 206 B.R. 569, 572 (Bankr.M.D.Ala. 1997). *See contra Patterson v. Spradlin (In re Patterson),* 185 B.R. 354, 356–57 (Bankr. N.D.Ala.1995).

Indeed, the Alabama Supreme Court in *Title Exchange* also quoted a portion of the trial court's opinion in which it specifically stated that it was *not addressing* the question of whether the transaction *perfected* the pawnbroker's interest in the car against third-party claimants:

> The language of Act 92–597 is sufficiently broad to encompass the practice of allowing a customer to retain physical possession of the pledged property with the pawnbroker retaining 'constructive possession' through exercise of actual physical possession of a set of keys and the endorsed, negotiable certificate of title to it. *Whether actual physical possession of the personal property itself is necessary to retain a perfected superior lien in the property is not an issue before the court.* (emphasis added)

*Title Exchange,* 620 So.2d at 579.

The only other reported Alabama appellate decision on the new pawnshop act, stemming from a pawnshop auto repossession in Mobile, came later that same year on August 20, 1993. It cited *Title Exchange's* ruling in a way that emphasized the narrowness of that decision:

> In *Title Exchange,* we held that an automobile certificate of title is "tangible personal property" within the meaning of the Alabama Pawnshop Act. *The effect of that decision was to hold that money-lending transactions involving the transfer of automobile certificates of title for the purpose of giving security are "pawn" transactions and not "small loan" transactions governed by the provisions of Alabama's Small Loan Act. Id.* at 578. We set out the relevant difference in the regulation of the two types of transactions, as follows:

"The Small Loan Act permits an interest rate of either two or three percent per month, depending on the amount of the unpaid balance, § 5–18–15(a), whereas the Pawnshop Act permits a charge of 25% of the principal amount per month. § 5–19A–7(a)." *Id.* at 578, n. 4.

*Downey,* 624 So.2d at 1376.

So neither state appellate decision even mentioned Alabama's Uniform Commercial Code, much less determined whether pawn transactions create the type of consensual liens which are governed by Article 9 of U.C.C. (*Ala.Code* § 7–9–101 et seq.). Neither decision, though both involved pawned auto titles, even mentioned the Alabama Uniform Certificate of Title and Antitheft Act (*Ala.Code* § 32–8–1 et seq. (1975)), much less determined whether perfection of non-possessory security interests created in pawned vehicles are governed by that act.

Consequently, there is no state *court* precedent on the issues raised in the Mattheiss case.

**B. However, the plain language of the statutes requires the conclusion that pawn transactions creating consensual liens under the Alabama Pawnshop Act of 1992 are *also* U.C.C. Article 9 secured transactions and must be perfected against third-party claimants under Article 9 and/or, in the case of automobiles, under the Alabama Uniform Certificate of Title and Antitheft Act.**

1. *The intent of the Legislature in enacting Article 9 of Alabama's U.C.C. was to include all transactions in which borrowers created consensual liens under the same consistent rules. Then, as now, it is the substance of the transaction and the intent of the contracting parties which determines whether a transaction is an Article 9 secured transaction or something else.*

The language of the statute as adopted by the Legislature appears to be unambiguous on what is covered by Article 9 of Alabama's U.C.C. Section § 7–9–102 is entitled **Policy and subject matter of article:**

(1) Except as otherwise provided in Section 7–9–104 on excluded transactions, this article applies:

(a) *To any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents,* instruments, general intangibles, chattel paper or accounts; and also

(b) To any sale of accounts or chattel paper.

(2) *This article applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security.* This article does not apply to statutory liens except as provided in Section 7–9–310.

(3) The application of this article to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this article does not apply. (emphasis added)

This broad definition was first adopted by the Legislature in 1965, and has not been amended since 1981, according to the Alabama Code. The Official Comment to this code section states the following:

The main purpose of this section is to bring *all consensual security interests in personal property and fixtures under this article,* except for certain types of transactions excluded by Section 7–9–104 (certain nonconsensual statutory liens)....

1. Except for sales of accounts and chattel paper, the principal test of whether a transaction comes under this article is: *Is the transaction intended to have effect as security?* For example, Section 7–9–104 excludes certain transactions where the security interest (such as an artisan's lien) arises under statute or common law by reason of status and not by consent of the parties. Transactions in the form of consignments or leases are subject to this article if the understanding of the parties or the effect of the arrangement shows that a security interest was intended.... When it is found that a security interest as

defined in Section 7–1–201(37)[1] was intended, this article applies *regardless of the form of the transaction or the name by which the parties may have christened it.* The list of traditional security devices in subsection (2) is illustrative only; *other old devices, as well as any new ones which the ingenuity of lawyers may invent, are included so long as the requisite intent is found.* The controlling definition is that contained in subsection (1).

The article does not in terms abolish existing security devices. The conditional sale or bailment-lease, for example, is not prohibited; *but even though it is used, the rules of this article govern.* (emphasis added)

So based on the language of the statute itself if the contracting parties intend to create a consensual lien as security for debt, the transaction is an Article 9 secured transaction and governed by the rules of Article 9, whatever it is called and whatever law in addition to U.C.C. may apply. *See Patterson v. Spradlin (In re Patterson)*, 185 B.R. 354, 356 (Bankr.N.D.Ala.1995).[2]

2. *Under its own terms, the U.C.C. may not be impliedly repealed or rescinded by subsequent statute. It must be done explicitly. The Alabama Pawnshop Act does just the opposite—it specifically states it does not repeal any of the U.C.C.*

As stated in the Code commissioner's note to *Ala.Code* § 7–1 (the first article of Alabama's Uniform Commercial Code), citing the 1962 Official Text with Comments of the Uniform Commercial Code (as amended in 1966):

"Uniformity throughout American jurisdictions is one of the main objectives of this Code; and that objective cannot be obtained without substantial uniformity of construction. To aid in uniform construction these Comments set forth the purpose of various provisions of this Act to promote uniformity, to aid in viewing the Act as an integrated whole, and to safeguard against misconstruction."

Section 7–1–104 is entitled **Construction against implicit repeal** and states the following:

This title being a general act intended as a unified coverage of its subject matter, *no part of it shall be deemed to be impliedly repealed by subsequent legislation if such construction can reasonably be avoided.* (emphasis added)

The official comment to this section states its "**Purposes**" as the following:

To express the policy that no Act which bears evidence of carefully considered permanent regulative intention should lightly be regarded as impliedly repealed by subsequent legislation. This Act, carefully integrated and intended as a uniform codification of permanent character covering an entire "field" of law, is to be regarded as *particularly resistant to implied repeal.* See *Pacific Wool Growers v. Draper & Co.,*

1. ***Ala.Code* § 7–1–201(37)** defines security interest:

a. "Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (Section 7–2–401) is limited in effect to a reservation of a "security interest." The term also includes any interest of a buyer of accounts or chattel paper which is subject to Article 9. The special property interest of a buyer of goods on identification of those goods to a contract for sale under Section 7–2–401 is not a "security interest", but a buyer may also acquire a "security interest" by complying with Article 9. Unless a consignment is intended as security, reservation of title thereunder is not a "security interest," but a consignment in any event is subject to the provisions on consignment sales (Section 7–2–326).

This subsection of Alabama's U.C.C. was amended extensively in 1992 in conjunction with the Legislature's adoption of U.C.C. Article 2A on leases. The lengthy Section 7–1–203(37)(b) resolved the issue of whether a lease was a true lease or a disguised security agreement in favor of lease status. The amendment thus specifically excluded consumer "rent-to-own" transactions from Article 9 as well as the commercial leases generally dealt with in new Article 2A. It should be noted that this section was not amended to exclude pawn or title pawn transactions from Article 9 when the Pawnshop Act was passed.

2. "Thus, the key to coverage under § 7–9–102 is whether the parties to the contract had the requisite intent to create a security interest, rather than the particular form in which the transaction arose."

*Patterson,* 185 B.R. at 356.

158 Or. 1, 73 P.2d 1391 (1937) (emphasis added).

Although the Alabama Legislature has made significant additions and revisions to many parts of Title 7 during the 1990s, this important prohibition against implied rescission has remained untouched.

Before the effective date of the Alabama Pawnshop Act, the State Banking Department had taken the position that the title pawn business, just then beginning to grow in Alabama, was not a "bona fide pawnbroking business" as excluded from the Small Loan Act (*Ala.Code* § 5–18–1 et seq.) Act 92–597 was enacted as an apparent remedy to this perceived problem. The preamble of the original act stated its purpose as the following:

> ... to establish the **"Alabama Pawnshop Act"**; *to provide for the pawnshop charge which may be charged by a pawnbroker* and to provide that amounts in excess of the pawnshop charge shall be uncollectible and shall void the pawn transaction; to prohibit certain acts by pawnbrokers and provide penalties for violations; to provide for the duties of pawnbrokers; to provide for regulatory licensing and inspection by certain officers and officials; to provide for liens for pawnbrokers; to provide for the redemption or automatic forfeiture of pledged goods; to provide for the satisfaction of liens of pawnbrokers; *to repeal Sections 8–1–80 to 8–1–84, inclusive, Code of Alabama 1975*; and to make an appropriation. (emphasis added)

So the preamble provided specifically for the repeal of *Ala.Code* §§ 8–1–80 to 8–1–84, former Alabama law on pawnshops. The first purpose listed in this preamble obviously was to specifically allow pawnbrokers to charge a "pawnshop charge" of 25 percent per month of the principal owed, or 300 percent on an annualized basis.[3]

■ The act did not provide for specific repeal of any U.C.C. section or specific exemption of pawn transactions from U.C.C. Article 9. In fact, Section 21 of Act 92–597 as approved, provided the following:

> All laws or parts of laws which conflict with this act are hereby repealed; and Sections 8–1–80 to 8–1–84, inclusive, Code of Alabama 1975, are specifically repealed. Notwithstanding the foregoing, all persons currently doing business as pawnbrokers and those seeking licensure under this act, shall be subject to the applicable licensing and issuance fees levied under Chapter 12 of Title 40 of the Code of Alabama 1975. *This act shall not repeal or be construed to repeal any provision of the Uniform Commercial Code, Sections 7–1 –101 et seq.* (emphasis added)

The version of this section of the act codified at *Ala.Code* § 5–19A–20, is entitled **Construction with other law.** and reads:

> Notwithstanding the foregoing (Section 5–19A–19 stated any city ordinances more restrictive on pawnbrokers than the new state law "shall be null and void."), all persons currently doing business as pawnbrokers and those seeking licensure under this chapter, shall be subject to the applicable licensing and issuance fees levied under Chapter 12 of Title 40. *This chapter shall not repeal or be construed to repeal any provision of the Uniform Commercial Code. Sections 7–1–101 et seq.* (emphasis added)

So by its own language, the Alabama Pawnshop Act specifically dictated that it would not repeal any portion of Alabama's Uniform Commercial Code and that it should not be construed to do so.

3. *Therefore, the attachment and perfection of security interests created by consensual pawn transactions are governed generally by U.C.C. Article 9. In the case of vehicles, that means perfection must be by actual possession pursuant to Ala.Code § 7–9–305 or on the title under the Ala. Code § 32–8–61.*

3. *Ala.Code* § 5–19A–7(a) is under the heading **Contract charges in lieu of interest—Excessive interest or charges:**

> A pawnbroker may contract for and receive *a pawnshop charge in lieu of interest or other charges for all services, expenses, costs and losses of every nature but not to exceed 25 percent of the principal amount, per month, advanced in the pawn transaction.* (emphasis added)

Subsection (b) states that any charge in excess of 25 per cent per month would be uncollectible and "the pawn transaction shall be void".

While growth of the title pawn industry was a precipitating factor for passage of Alabama's new pawnshop act, Section 5–19A–2(6) of the Pawnshop Act defines "Pledged goods" in the following way:

> Tangible personal property other than choses in action, securities, or printed evidences of indebtedness, which property is purchased by, *deposited with, or otherwise actually delivered into the possession of, a pawnbroker in connection with a pawn transaction.* (emphasis added)

The case note to this definition of "Pledged goods" cites *Floyd v. Title Exchange and Pawn of Anniston, Inc.*, 620 So.2d 576 (Ala. 1993) for the proposition that:

> Although it is questionable whether an automobile certificate of title is "tangible personal property," as that term is generally understood, an automobile certificate of title is not a "chose in action" which the legislature specifically excluded from the definition of "pledged goods."

Definitions within the Pawnshop Act itself describe consensual transactions where the intent is to secure an indebtedness, the subject matter of U.C.C.'s Article 9. For example, "Pawn Transaction" is defined by Section 5–19A–2(3) as the following:

> *Any loan on the security of pledged goods* or any purchase of pledged goods on condition that the pledged goods are left with the pawnbroker and may be redeemed or repurchased by the seller for a fixed price within a fixed period of time. A "pawn transaction" does not include the pledge to, or the purchase by, a pawnbroker of real or personal property from a customer followed by the sale or leasing of that property back to the customer in the same or a related transaction.

Similarly, a "Pawnbroker" is defined by Section 5–19A–2(4) in this way:

> *Any person engaged in the business of lending money on the security of pledged goods left in pawn, or in the business of purchasing tangible personal property to be left in pawn on the condition that it may be redeemed or repurchased by the seller for a fixed price within a fixed period of time....* (emphasis added)

It seems clear that pawn transactions in which a debtor consensually grants the pawnbroker a security interest in goods (including title documents and the vehicles they represent) are secured transactions under *Ala.Code* § 7–9–101 et seq. Consequently, the attachment and perfection rules of Article 9 apply to pawnshop loans collateralized by these differing types of goods.

Under Article 9, for the security interest to become enforceable even between the debtor and the pawnbroker, three requirements set out in Section 7–9–203(1) must be met. Those requirements include: (1) the pawnbroker must have possession of the collateral pursuant to an agreement or have a security agreement signed by the debtor describing the collateral; (2) that value has been given by the pawnbroker; and (3) the debtor had rights in the collateral in which the security interest is conveyed.[4]

The traditional pawn transaction or a "Pawn Transaction" as defined by Section 5–19A–2[5] (in which the debtor leaves the col-

4. ***Ala.Code* § 7–9–203(1)** provides the following: (1) Subject to the provisions of Section 7–4–210 on the security interest of a collecting bank and Section 7–9–113 on a security interest arising under the article on sales, or the article on leases, a security interest *is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:*
(a) *The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral* and in addition, when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned; and
(b) *Value* has been given; and
(c) The debtor has *rights* in the collateral. (emphasis added)
(This version of Section 7–9–203(1) was in effect December 19, 1996 when TLE's security interests would have attached. An amended version, effective January 1, 1997, is not materially different as it applies to this situation.)

5. ***Ala.Code* § 5–19A–2(3)** defines a "pawn transaction" under the Alabama Pawnshop Act as "Any loan on the security of *pledged goods* ..." while ***Ala.Code* § 5–19A–2(6)** defines "pledged goods" as "Tangible personal property ... *which property* is purchased by, *deposited with, or otherwise actually delivered into the possession of, a pawnbroker in connection with a pawn transaction.*" (emphasis added)

lateral at the pawnshop) can fulfill requirements for both attachment and perfection under the U.C.C. at one time. In a title pawn transaction, the customer typically executes an agreement by which he delivers goods—including his certificate of title and perhaps an extra set of car keys to the pawnbroker. He also signs a contract listing other goods (the vehicle itself which the debtor keeps) as security for the title pawn loan. He receives his loan proceeds.

At that point, the security interest has "attached" to *all* the goods described in the pawn contract (security agreement) under U.C.C. Section 7–9–203(1) and is enforceable against the debtor and his property. The security interest has been *created* in both the items left in the pawnbroker's possession and in the vehicle which the debtor drives away.

Additionally, the security interest in the *goods left in the possession of the pawnbroker* is also perfected pursuant to Section 7–9–305 against third-party claimants, including subsequent lenders or a bankruptcy trustee representing the debtor's unsecured creditors. Section 7–9–305 provides that a security interest in goods (tangible personal property) may be perfected by the secured party (pawnbroker) "taking possession of the collateral." That possession/perfection normally takes place the day the debtor pawns the goods. A pawnbroker can attain perfection in a debtor's certificate of title, his spare car keys and, indeed the car itself, *if* the debtor turns these items over to the pawnbroker.

If a debtor hands over only his certificate of title and other appurtenances of ownership such as the car keys, keeping *actual possession* of the car, the pawnbroker has an *attached* security interest in the title, the keys *and* the car. Further, the pawnbroker has a perfected security interest in the goods "actually delivered into the possession of the pawnbroker". *See* Section 5–19A–2(3).

The pawnbroker's attached nonpossessory security interest in the vehicle itself is also enforceable against the debtor. However, the interest in the car is not "perfected" against other claimants without further action. U.C.C. Section 7–9–302 requires filing of a financing statement for perfection of most non-possessory security interests in goods. In the case of vehicles, Section 7–9–302(3)(b) provides the following method of perfection:

(3) The filing of a financing statement otherwise required by this article is *not necessary or effective to perfect a security interest in property subject to:* ...

(b) *The following statutes of this state: any certificate of title statute covering automobiles, trailers, mobile homes, boats, farm tractors or the like,* and any central filing statute; but during any period in which collateral is inventory held for sale by a person who is in the business of selling goods of that kind, the filing provisions of this article (Part 4) apply to a security interest in the collateral created by him as debtor; or

(c) *A certificate of title statute of another jurisdiction under the law of which indication of a security interest on the certificate is required as condition of perfection* (subsection (2) of Section 7–9–103),(emphasis added)

■ So in order for a pawnbroker to perfect a nonpossessory, nonpurchase-money security interest in a vehicle subject to Alabama's Uniform Certificate of Title and Antitheft Act, the pawnbroker, like any other Alabama creditor, must deliver an executed application for a title showing it as lienholder on the vehicle pursuant to Section 32–8–61 [6].

■ Additionally, perfection against third party claimants dates from the time the

6. ***Ala.Code* § 32–8–61** provides the following:
(a) Unless excepted by this section, *a security interest in a vehicle for which a certificate of title is required by the terms of this chapter is not valid against creditors of the owner or subsequent transferees or lienholders of the vehicle unless perfected as provided in this article.*
(b) *A security interest is perfected by the delivery to the department of the existing certificate of title. if any, an application for a certificate of title containing the name and address of the lienholder and the date of his security agreement and the required fee. It is perfected as of the time of its creation if the delivery is completed within 20 days thereafter, otherwise, as of the time of the delivery.* (emphasis added)

State Department of Motor Vehicles actually receives the application. Or, if the application has been delivered to the State Department of Motor Vehicles within 20 days of the creation of the security interest, the perfection will "relate back" to the actual contract/pawn transaction date rather than the later delivery date.

## II.

***TLE's interest in Mattheiss' 1992 Mercury Sable was an attached, but unperfected U.C.C. Article 9 security interest when the 90-day preference period before bankruptcy began.***

On December 19, 1996, Lisa Marie Mattheiss signed documents fulfilling the Article 9 requirements that a security agreement grant the creditor a security interest and describe the collateral. She granted TLE a security interest in both "(The following described motor vehicle and the certificate of title as issued by the Motor Vehicle Department.)" In return, Mattheiss received a $1,400.00 loan from TLE. Mattheiss had rights in both title and car when she conveyed the security interest in both.

At that point, December 19,1996, TLE's security interest "attached" to both the certificate of title and to the 1992 Mercury Sable pursuant to U.C.C. Section 7-9-203(a). However, since Mattheiss only delivered possession of the title to TLE, while retaining possession of the car, only TLE's security interest in the certificate, the piece of paper, was also perfected as of December 19, 1996.

TLE had possession of executed documents which would have allowed it to apply for a new title showing it as lienholder on the car December 19, 1996. Since the pawnbroker had not retained possession of the vehicle and secured its interest in this way, application for the new title pursuant to Section 32-8-61 was the step required for perfection of its security interest in the car.

If the pawnbroker had delivered the title application within 20 days after December 19, 1996, its security interest in the car would have been deemed perfected as of December 19, 1996. However, both parties have stipulated that TLE applied for the title February 28, 1997—outside the 20-day "relation-back" period allowed by Section 32-8-61. Consequently, under terms of the statute, perfection began at "the time of delivery." Based on the stipulation, the delivery day could be deemed to be no earlier than February 28, 1997.

So TLE took action to perfect its security interest in the car via title within the 90 days prior to Mattheiss' March 5, 1997 bankruptcy filing. Likewise, TLE's action to take possession of the car came March 4, 1997 and was also in the 90-day period.

## III.

***Mattheiss' legal and equitable interests in the Mercury were rights cognizable as property of her bankruptcy estate pursuant to 11 U.S.C. § 541(a).***

**A. 11 U.S.C. § 541(a)(1) creates a bankruptcy estate comprised of "all legal or equitable interests of the debtor in property" "wherever located and by whomever held" at the time the petition is filed.**

When a debtor files a bankruptcy petition, an entity called the bankruptcy estate is created by operation of law. Less state law exemptions claimed by the debtor, this is the pool of resources available for distribution to the debtor's creditors in the order provided by the Bankruptcy Code. 11 U.S.C. § 541(a)(1) provides an expansive definition of the types of interests that automatically become property of the estate, and case law interpreting that statute has maintained that broad definition. Section 541(a)(1) provides that the debtor's bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case" "wherever located and by whomever held . . .".[7]

The United States Supreme Court's *United States v. Whiting Pools,* 462 U.S. 198, 103

7. **11 U.S.C. § 541(a)** provides in pertinent part that:

(a) The commencement of a case under section 301,302, or 303 of this title creates an estate. Such *estate is comprised of all the*

S.Ct. 2309, 76 L.Ed.2d 515 (1983) is still the defining case for determining what is and is not property of the bankruptcy estate in repossession situations. In that case, the court forced the Internal Revenue Department to return business property seized prepetition from a Chapter 11 debtor because the debtor's interests in the property were deemed property of the bankruptcy estate. *See also Meehan v. Wallace (In re Meehan),* 102 F.3d 1209, 1210 (11th Cir.1997); and *Commercial Federal Mortgage Corp. v. Smith (In re Smith),* 85 F.3d 1555, 1558 (11th Cir.1996).

**B. Lisa Marie Mattheiss' legal and equitable interests in the Mercury Sable became property of her bankruptcy estate, to be administered by the trustee, when she filed Chapter 13 March 5, 1997.**

On the day Lisa Marie Mattheiss filed her Chapter 13 petition, TLE held a properly perfected security interest in a title document, the actual piece of paper she had turned over to it on December 19, 1997. On February 28, 1997, the parties have agreed that TLE filed a title application to perfect TLE's security interest in the 1992 Mercury Sable, the subject of the certificate of title.

March 4, 1997, TLE took physical possession of the car by repossession.

Despite repossession, Mattheiss still had legal and equitable rights in the vehicle the next day, March 5, 1997, when she filed bankruptcy. Those rights became property of her bankruptcy estate. Those rights, as of the March 5, 1997 petition date, included the following:

First, although TLE had applied for issuance of a new title listing it as lienholder, Lisa Marie Mattheiss was and *is* listed on a valid certificate of title as *owner* of the Mercury. Further, under terms of her contract, Mattheiss had until March 19, 1997, after the bankruptcy petition was filed, to redeem the vehicle by payment of $2,100.00 (the original $1,400.00 principal plus two months' $350 "pawn charge"). Rights of redemption are created both by private contract based on statute (Section 5–19A–10(b)); [8] and by the statutory right created by U.C.C. for all collateral repossessed under Article 9. *See Ala. Code* § 7–9–506.[9] *See Patterson v. Spradlin (In re Patterson),* 185 B.R. 354, 357 (Bankr. N.D.Ala.1995); and *Turner v. DeKalb Bank (In re Turner),* 209 B.R. 558, 562 (Bankr. N.D.Ala.1997).

On March 5, 1997, all of these legal and equitable rights became property of the bankruptcy estate to be administered by the bankruptcy trustee for the benefit of creditors. These rights also made the repossessed vehicle subject to turnover under 11 U.S.C. § 542.[10] In the face of Mattheiss' turnover lawsuit, TLE voluntarily returned possession of the car to the debtor on March 14, 1997.

*following property, wherever located and by whomever held:*

(I) Except as provided in subsections (b) and (c)(2) of this section, *all legal or equitable interests of the debtor in property as of the commencement of the case.* (emphasis added)

8. ***Ala.Code* § 5–19A–10(b)** provides:

Pledged goods not redeemed on or before the maturity date if fixed and set out in the pawn ticket issued in connection with any transaction *shall be held by the pawnbroker for 30 days following that date and may be redeemed* or repurchased by the pledgor or seller *within the period by the payment of the originally agreed redemption price, and by the payment of an additional pawnshop charge equal to the original pawnshop charge.* (emphasis added)

9. ***Ala.Code* § 7–9–506** provides:

**Debtor's right to redeem collateral.**

At any time before the secured party has disposed of collateral or entered into a contract for its disposition under Section 7–9–504 or before the obligation has been discharged under subsection (2) of Section 7–9–505 the debtor or any other secured party may unless otherwise agreed in writing after default redeem the collateral by tendering fulfillment of all obligations secured by the collateral as well as the expenses reasonably incurred by the secured party in retaking, holding and preparing the collateral for disposition, in arranging for the sale, and to the extent provided in the agreement and not prohibited by law, his reasonable attorneys' fees and legal expenses.

10. **11 U.S.C. § 542(a)** provides the following:

Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of *property that the trustee may use, sell, or lease* under section 363 of this title, or that the debtor may exempt under section 522 of this title, *shall deliver to the trustee, and account for, such property* or the value of such

Further, postpetition passage of the grace period on March 19, 1997 could not convert ownership of the vehicle from Mattheiss to TLE. The Alabama Pawnshop Act Section 5–19A–6 provides "... *Pledged goods* not redeemed within 30 days following the originally fixed maturity date shall be forfeited to the pawnbroker and absolute right, title, and interest in and to the goods shall vest in the pawnbroker."

For that section only applies to "pledged goods" and under Section 5–19A–3(6) pledged goods are only those goods "... *actually delivered into the possession* of the pawnbroker ...". The "constructive possession" in *Title Exchange* is a concept sufficient to bring the higher Pawnshop Act interest rate into play for "title pawn" vehicle loans, in the Alabama Supreme Court's view. However, the "constructive possession" concept is insufficient to constitute the actual possession required to convert the legal title by operation of law under Section 5–19A–6. By its very definition, a "constructive" possession is as *opposed* to an "actual" possession.

So on March 19, 1997, TLE became owner of whatever specific piece of paper it had in its possession at that time. But Section 5–19A–6 could not operate to transfer legal title or other property rights in the car. For Mattheiss never consensually "*actually* delivered" the vehicle into the possession of TLE.

## IV.

***Since Mattheiss' rights in the car are property of the estate, the February 28, 1997 perfection of TLE's security interest may be avoided as a preference pursuant to 11 U.S.C. § 547(b)***

**A. A bankruptcy trustee may avoid any transfer of a debtor's property made in the 90 days prior to bankruptcy, so long as all other elements for an avoidable preference under 11 U.S.C. § 547(b) are present.**

A bankruptcy trustee may avoid as a "preference" transfers, including perfection of security interests, which meet the requirements of 11 U.S.C. § 547(b). Avoidance frees the asset for claim of exemption by the debtor and/or possible distribution to other creditors. That section provides:

> (b) Except as provided in subsection (c) of this section, *the trustee may avoid any transfer of an interest of the debtor in property*—
>
> (1) to or for *the benefit of a creditor;*
>
> (2) for or on account of an *antecedent debt* owed by the debtor before such transfer was made;
>
> (3) made while the *debtor was insolvent;*
>
> (4) made—
>
> (A) *on or within 90 days before the date of the filing of the petition;* or
>
> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that *enables such creditor to receive more than such creditor would receive if*—
>
> (A) the *case were a case under chapter 7* of this title;
>
> (B) the *transfer had not been made*; and
>
> (C) such *creditor received payment of such debt to the extent provided by the provisions of this title.*

**B. Mattheiss' transaction with Title Loan Express comprises all the elements required for a finding that the trustee may avoid perfection of the security interest as a preference pursuant to 11 U.S.C. § 547(b).**

TLE's application for a new title showing it as lienholder, its perfection of the security interest in the car itself, is the "transfer of an interest of the debtor in property" the trustee seeks to avoid under 11 U.S.C. § 547(b).

property, unless such property is of inconsequential value or benefit to the estate. (emphasis added)

That transfer was certainly for "the benefit of the creditor", TLE, since it would have made the pawnbroker's interest invulnerable to other claimants like the trustee. It was also made "on account of an antecedent (prior) debt", since Mattheiss received the $1,400.00 loan on December 19, 1996.

Further, Mattheiss' schedules of income, assets and liabilities shows that she was insolvent on February 28, 1997 when the parties agreed the application for title was made. (Her insolvency has not been disputed.) Since TLE attempted perfection more than 60 days after the loan, the perfection could not "relate back" to the December 19, 1996 transaction. It was effective no earlier than the stipulated application date and thus the transfer was attempted five days before Mattheiss' bankruptcy filing. So the transfer came well within the 90-day preference period of 11 U.S.C. § 547(b).

If the transfer remained in effect, TLE would clearly receive more as a *secured* creditor than it would if the transfer had not been made and TLE were an *unsecured* creditor in a Chapter 7 liquidation case.

Consequently, TLE's attempted February 28, 1997 perfection of its two-month-old security interest in the automobile may be avoided by the trustee under 11 U.S.C. § 547(b).

**C. Mattheiss, however, cannot avoid TLE's lien herself pursuant to 11 U.S.C. § 522(f) because it is not the type of involuntary lien which can be avoided after turnover pursuant to 11 U.S.C. § 522(g).**

11 U.S.C. § 522(f) [11] provides, generally, a debtor may avoid the fixing of a lien "on an interest of the debtor in property to the extent that such lien impairs an exemption" that the debtor could have claimed. However, 11 U.S.C. § 522(g) [12] does not allow a debtor to claim an exemption on turned over property when the lien avoided was created by consent.

If the TLE lien avoided as unperfected had been a judicial lien, Section 522(f) would apply. However, Mattheiss' December 19, 1996 contract with TLE provided for a voluntary transfer of the security interest.

**D. The trustee's avoidance of TLE's lien pursuant to 11 U.S.C. § 547 does not mean that TLE should be ordered to show its lien paid in full on the title.**

Mattheiss in her amended complaint for turnover has asked the court to enter an order avoiding all liens claimed by TLE and further that TLE deliver to Mattheiss the title to the vehicle with all liens marked "paid in full". Mattheiss' complaint asking that TLE's lien be shown paid in full is premature. TLE's lien on Mattheiss' automobile has been avoided by the trustee pursuant to 11 U.S.C. § 547, but Mattheiss' Chapter 13 plan has neither been confirmed nor has the plan been completed, and therefore could be dismissed prior to a discharge being entered. 11 U.S.C. § 349(b)(1)(B) provides that the dismissal of a case, unless otherwise ordered, reinstates "any transfer avoided under Section 522, 544, 545, *547*, 548, 549, or 724(a) of this title or preserved under § 510(c)(2), 522(i)(2), or 551 of this title." Therefore, Mattheiss' complaint for the turnover of the title with the lien marked paid in full is due to be denied.

## CONCLUSION

Mattheiss' transaction with TLE was a U.C.C. Article 9 secured transaction (*Ala.Code* § 7–9–1 et seq.) as well as a pawn

11. **11 U.S.C. § 522(f)** provides in pertinent part that:

> ... the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) ...

In Alabama, the exemptions applied in bankruptcy are the exemptions also applicable to execution of state court judgments.

12. **11 U.S.C. § 522(g)** provides in pertinent part:

> (g) Notwithstanding sections 550 and 551 of this title, the debtor may exempt under subsection (b) of this section property that the trustee recovers under section 510(c)(2), *542*, 543, *550*, *551*, or 553 of this title, to the extent that the debtor could have exempted such property under subsection (b) of this section if such property had not been transferred *if*—
>
> (1)(A) *such transfer was not a voluntary transfer of such property by the debtor;* ... (emphasis added)

transaction covered by Alabama's 1992 Pawnshop Act (*Ala.Code* 5–19A–1 et seq.) Consequently, the rules of Article 9 and of the Alabama Uniform Certificate of Title and Antitheft Act (*Ala.Code* § 32–8–1 et seq., specifically Section 32–8–61) govern perfection of TLE's security interest in Mattheiss' 1992 Mercury Sable.

Lisa Marie Mattheiss still held legal and equitable interests in the vehicle March 5, 1997 when she filed bankruptcy that became property of the estate under 11 U.S.C. § 541(a)(1) and were thus subject to turnover pursuant to 11 U.S.C. § 542.

Under the U.C.C. and certificate of title act, TLE's attempt at perfection of its security interest in the automobile came no earlier than February 28, 1997. Consequently, the transfer was attempted within the 90-day preference period before Mattheiss filed bankruptcy. The transaction also included all other elements necessary for the trustee to avoid transfer of the security interest under 11 U.S.C. § 547(b).

TLE's perfection of its security interest in the automobile having been avoided, the court finds that TLE's Claim No. 1 is secured only by the title certificate in its possession.

To the extent of this Memorandum, the court thus finds in **FAVOR** of the debtor/plaintiff, Lisa Marie Mattheiss; and in **FAVOR** of the defendant/chapter 13 standing trustee, C. David Cottingham, Esq., on his *Cross-Claim and Counterclaim;* and **AGAINST** the defendant/creditor, Title Loan Express of Northport, Alabama and **AGAINST** the debtor/plaintiff Mattheiss (on the issue of avoidance under 11 U.S.C. § 522( ) and on the issue of satisfying TLE's lien on the certificate of title.)

A order, consistent with these findings pursuant to Fed. R. Bankr.P. 7052, will be entered separately.

**DONE and ORDERED.**